IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MILO, LLC, | : | CIVIL ACTION, |
| | : | |
| Plaintiff, | : | NO.: 2:16-cv-05759-RBS |
| | : | |
| v. | : | |
| | : | |
| VIRGIL PROCACCINO, *ET AL.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| VIRGIL PROCACCINO, ARTHUR ELWOOD | : | |
| and 200 CHRISTIAN STREET PARTNERS, LLC | : | |
| | : | |
| | : | |
| Third-party Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| AB CONSTRUCTION, LLC DUGGAN | : | |
| EXCAVATION, E&A DRYWALL CORP., | : | |
| HIGH END DESIGN INC., JELD-WEN, INC., | : | |
| MAXI-TECH, INC. RED LION INSULATION, | : | |
| STANLEY STEPHENS CO., INC., AND TAGUE | : | |
| LUMBER. | : | |
| | : | |
| Third-party Defendants. | : | |

### MEMORANDUM OF LAW IN SUPPORT OF THIRD-PARTY PLAINTIFFS' OPPOSITION TO THIRD-PARTY DEFENDANTS JELD-WEN INC. AND TAGUE LUMBER OF MEDIA, INC.'S MOTION TO DISMISS THE THIRD-PARTY COMPLAINT

## TABLE OF CONTENTS

<u>TABLE OF AUTHORITIES</u> …………………………………………………...……4

<u>I. Matter Before The Court</u> ……………………………………………...………...7

<u>II. Statement of Questions Involved</u> …………………………………………...……… 7

<u>III. Statement of Procedural History and Facts</u> …………………………………...…………… 9

<u>IV. Summary of Argument</u> …………………………………………………...…………… 10

<u>V. Argument</u> …………………………………………………………...……… 11

    A. The Third-party Complaint Alleges Facts With Specificity Sufficient Enough to Survive Defendants' Fed. R. Civ. P. 12(b)(6) Motion ………………..…… 11

    B. Claim Preclusion Does not Bar 200 CSP's Claims For Negligence, Strict Products Liability, and Breach of Implied Warranty Because Defendants Have Failed To Satisfy The Three Requirements Necessary For Claim Preclusion To Apply ………………………………..…………………………. 13

    C. All Defendants Assertion That Collateral Estoppel (Otherwise Referred to as Issue Preclusion) Bars Several of 200 CSP's Claims Is Without Merit As Defendants Have Failed To Satisfy The Requirements For The Doctrine To Apply……………………………………………………………………..……14

    D. 200 CSP's Claims Against Defendants Are Not Barred by the Economic Loss Doctrine or Gist of the Action Doctrine Because Jeld-Weld's Tortious Performance Was Collateral to Its Agreement to Supply Windows and Window Components………………………………………………………..15

        1. Economic Loss Doctrine ………...……………………………………16

        2. Gist of the Action Doctrine …………………………………………18

    E. The disclaimer of warranties discussed at length in defendants' Rule 12(b)(6) motion is not integral to or explicitly relied upon in 200 CSP's complaint and they should be excluded from this Courts consideration of defendants' Rule 12(b)(6) motion……………………………………………………………19

**F.  200 CSP's Common Law Indemnification and Contribution Claims Are Proper Because Defendants and Hague Lumber are Either Solely or Jointly Liable for the Klehr Injuries**……………………………………………………….. **20**

**G.  Defendant's Argument That 200 CSP Has Attempted to Shift The Burden of Proof Is Untimely For a Fed. R. Civ. P. 12(b)(6) Motion**…………………….... **24**

**IV. <u>Relief</u>** …………………………………………………………………………… **25**

# TABLE OF AUTHORITIES

## Cases

*Allessandro v. State Farm Mutual Auto. Ins. Co.*, 409 A.2d 247 (Pa. 1979)…………………...12

*Am. Stores Props., Inc. v. Spotts, Stevens & McCoy, Inc.*, 648 F.Supp.2d 707 (E.D. Pa. 2009)..10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ………………………………………………… 11, 19, 23

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ……………………………………… 11, 19, 23

*Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra*, 983 F.2d 495 (3d Cir. 1992) …………………………………………………………………………………………12

*Bruno v. Erie Insurance Co. See* 106 A.3d 48 (Pa. 2014) ………………………………………...17

*Chin v. Chrysler LLC*, 528 F.3d 272 (3d Cir. 2008)..…………………………………………10

*Davis v. United States Steel Supply*, 688 F.2d 166 (3d Cir. 1982)..………………………….....13

*DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209 (3d Cir. 2007) …………………………....10

*Dommel Props. LLC v. Jonestown Bank and Tr. Co.*, 626 F. App'x 361 (3d Cir. 2015)……… 17

*Erie R.R. v. Tompkins*, 304 U.S. 64 (1938) ………………………………………………….10

*E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986) ……………………... 15

*EQT Prof. Co. v. Terra Servs., LLC,* 179 F.Supp.3d 486 (W.D. Pa. 2016) ……………………20

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009)…………………………………… 23

*Gadley v. Ellis*, No. 3:13-17, 2015 WL 2345619 (W.D. Pa. May 15, 2015)…………………... 16

*Giannini v. Foy*, 421 A.2d 338 (Pa. Super. 1980) …………………………………………... 12

*Grode v. Mutual Fire, Marine, and Inland Ins. Co.*, 623 A.2d 933 (Pa. Cmwlth. 1993)……… 18

*Harka v. Nabati,* 487 A.2d 432 (1985) ……………………………………………………… 21

*Harleysville Homestead Inc. v. Lower Salford Twp. Auth.*, 980 A.2d 749 (Pa. Cmwlth. 2009)...17

*Honeywell Int'l Inc. v. Archdiocese of Phila.*, No. 2219 (Phila. Cty. Ct. C.P. Oct. 24, 2001) … 18

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244 (3d Cir. 2006)……………14

*Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250 (3d Cir. 1994) ………………… 11

*Meyer v. Cmty. College of Beaver Cty.*, 965 A.2d 406 (Pa. Cmwlth. 2009) …………………... 18

*Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022 (Pa. Super. 2005) ……………………………... 21

*Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328 (Fed. Cir. 2004) ……………………...14

*Pansini v. Trane Co.*, No. 17-3948, 2018 WL 1172461 (E.D. Pa. Mar. 6, 2018) ……………... 16

*Pennfield Corp v. Meadow Valley Electric Co.*, 604 A.2d 1082 (Pa. Super. Ct. 1992) ……….. 23

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993)....11, 19

*Phillips v. Cty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008) ……………………………………... 11

*Praisner v. Stocker*, 459 A.2d 1255 (Pa. Super. 1983) ………………………………………… 12

*Preferred Contractors Ins. Co., RRG, LLC v. Sherman*, __A.3d__,__(Pa. Super. 2018) (slip op. at *10), decided on July 24, 2018 ………………………………………………………….. 22, 23

*Rocks v. City of Phila.*, 868 F.2d 644 (3d Cir. 1989)…………………………………………..... 10

*Simmons v. City of Phila.*, 947 F.2d 1042 (3d Cir. 1991) …….………………………………... 10

*Smith v. Pulcinella*, 656 A.2d 494 (Pa. Super. 1995)…………………………………………21

*Voyles v. Corwin,* 441 A.2d 381 (Pa. Super. 1982) …………………………………………..21

*Walasavage v. Marinelli*, 483 A.2d 509 (Pa. Super. 1984) ………………………………... 20, 21

*Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2 850 (Pa. 1997) ………………... 20

**Federal Statutes**

28 U.S.C. § 1332 ………………………………………………………………………………….. 10

28 U.S.C. § 1367 ………………………………………………………………………………….. 10

**Pennsylvania Statutes**

42 Pa.C.S.A. § 8324 ……………………………………………………………………………… 20

42 Pa.C.S.A. § 8322 ……………………………………………………………………………… 20

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 9 …………………………………………………………………... 11

Fed. R. Civ. P. 8(a)(2) ………………………………………………………….. 11

Fed. R. Civ. P. 12(b)(6) …………………………………………………… 9, 10, 16, 23

**Miscellaneous**

Prosser, Law of Torts, § 46 n. 2 (4th Ed. 1971) ………………………………………….. 21

## I.      MATTER BEFORE THE COURT

Third-party Plaintiffs 200 CHRISTIAN STREET PARTNERS, LLC, VIRGIL PROCACCINO, and ARTHUR ELWOOD (collectively "200 CSP") by their attorneys WADE CLARK MULCAHY LLP, hereby submit the instant memorandum of law in support of their Opposition to Third-party Defendants JELD-WEN, INC. and TAGUE LUMBER OF MEDIA, INC.'s (collectively "Defendants") Motion to Dismiss the Third-Party Complaint.

## II.     STATEMENT OF QUESTIONS INVOLVED

1.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied because 200 CSP has properly stated a claim upon which relief can be granted.

Answer Advocated: Yes.

2.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied because claim preclusion does not bar 200 CSP's claims against Defendants.

Answer Advocated: Yes.

3.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied because collateral estoppel is unavailable to Defendants in relation to the issues of the economic loss doctrine, gist of the action doctrine, and the applicability of any disclaimer of implied warranties.

Answer Advocated: Yes.

4.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied because the economic loss doctrine and gist of the action doctrine are inapplicable to the present matter.

Answer Advocated: Yes

5.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied because 200 CSP has standing to pursue tort claims against Defendants.

Answer Advocated: Yes.

6.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied

because any disclaimer of implied warranties was not integral to or explicitly relied

upon in 200 CSP's third-party complaint.

Answer Advocated: Yes.

7.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied

because 200 CSP common law indemnification and contribution claims are proper

given Defendants can be found liable on an underlying negligence claim.

Answer Advocated: Yes.

8.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied

because common law indemnification is available to 200 CSP, as Defendants are

solely liable to MILO for any damages they sustained.

Answer Advocated: Yes.

9.      Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied

because 200 CSP's claim for contribution may proceed, as 200 CSP, if found to be

liable for any damages to MILO, will be joint tortfeasors with Defendants such that

contribution is applicable.

Answer Advocated: Yes.

10.     Whether Defendants' Motion to Dismiss the Third-Party Complaint must be denied

because Defendants' assertion that 200 CSP is forcing Defendants to "exculpate"

themselves is both incorrect and untimely for a Fed. R. Civ. P. 12(b)(6) motion.

Answer Advocated: Yes.

### III.   STATEMENT OF PROCEDURAL HISTORY AND FACTS

MILO, LLC ("MILO") sued 200 CSP for various alleged defects with a home located at 501A South 12th Street, Philadelphia, Pennsylvania 19147 (the "Home") that MILO purchased from 200 CSP. *See Pls.' First Am. Compl.* (**Exhibit A**[1]). MILO claims that 200 CSP made various mistakes with respect to the construction of the Home. *Id*.

On May 2, 2018, 200 CSP filed a Third-Party Complaint against the subcontractors responsible for the actual building of the home purchased by MILO. *See Third-party Complaint*. (**Exhibit B**). Among other things, the Third-Party Complaint alleges that Jeld-Wen, Inc. manufactured and sold the windows used in the construction of the house to Tague Lumber. *See* Exhibit B, ¶ 25. The Third-Party Complaint also alleges that Tague Lumber sold defective windows and building materials that were used in the construction of the Home. *See* Exhibit B, ¶ 28. The Third-Party Complaint alleges with specificity that Defendants breached implied warranties for merchantability and fitness for a particular purpose and that the windows sold by Defendants and used in the construction of the home were defective and unreasonably dangerous. *See* Exhibit B, ¶¶ 42-57. Further, the Third-Party Complaint alleges Defendants negligently failed to adhere to industry standards and failed to comply with applicable building codes and that, because of these failures, the damages alleged by MILO in the underlying complaint were caused in whole or in part by Defendants' negligence. *See* Exhibit B, ¶¶ 38-39.

#### A.   The *Klehr* Litigation

Currently pending in the Pennsylvania Court of Common Pleas for Philadelphia County is *Klehr, et al. v. Pracaccino, et al.*, Docket No. 02547 ("Klehr Litigation"). *See Third-party Pls.' Third-party Complaint* (**Exhibit C**). That litigation is related to a home purchased by Zachary and

---

[1] Unless otherwise noted, all referenced exhibits are attached to this brief.

Deborah Klehr (the "Klehrs") located at 507 S. 12th Street, Philadelphia, Pennsylvania. 200 CSP oversaw the construction of the Klehrs home and Defendants manufactured and supplied materials used in the construction of the home. *See Exhibit C*. Following the Klehrs' initiation of litigation, 200 CSP filed a Third-Party Complaint against the parties responsible for supplying the materials and constructing the Klehrs home, including defendants. *See Exhibit C*. Defendants filed Preliminary Objections to the Third-Party Complaint and on August 16, 2018, the Court issued an order dismissing three of the Third-Party Complaint's counts against Defendants. *See Klehr Order of 8/16/18* (**Exhibit D**). Notably, the Court did not provide the reasoning behind the decision to dismiss these three counts. *See Klehr Order of 8/16/18.* The Order permitted 200 CSP to file an amended complaint, which was subsequently filed. The Klehr litigation is currently still pending.

On October 8, 2018, Defendants filed a Motion to Dismiss the Third-Party Complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). As discussed in greater detail below, 200 CSP's complaint adequately states claims upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). Subsequently, Defendants Fed. R. Civ. P. 12(b)(6) motion must be denied.

## IV.    SUMMARY OF ARGUMENT

Defendants Fed R. Civ. P. 12(b)(6) Motion should be denied for the following reasons. First, 200 CSP has adequately pleaded facts that state a claim upon which relief can be granted sufficient enough to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss. Second, Defendants have failed to show the concurrence of the three conditions required for claim preclusion to bar further litigation as the *Klehr* litigation is based on a different cause of action and is still currently pending. Third, and like the argument against Defendants' assertion of claim preclusion, collateral estoppel is unavailable to defendants because the *Klehr* litigation relates to factually separate causes of action and is still currently pending. Fourth, the economic loss and gist of the action doctrines are inapplicable to the present matter because Defendants' tortious performance was collateral to any

agreement to supply building supplies that existed between Defendants and 200 CSP. Fifth, the disclaimer of warranties Defendants' argue disclaimed an implied warranty of fitness for an ordinary purpose is not explicitly relied upon or integral to the third-party complaint and therefore it should not be considered by this Court within the context of this Fed. R. Civ. P. 12(b)(6) motion. Finally, Defendants' argument that 200 CSP has attempted to shift any burden of proof is untimely for a Fed. R. Civ. P. 12(b)(6) motion.

For the reasons set forth in this memo of law, Defendants' motion must be denied.

## V.   ARGUMENT[2]

### A.   The Third-party Complaint Alleges Facts With Specificity Sufficient Enough To Survive Defendants' Fed. R. Civ. P. 12(b)(6) Motion.

A party may move to dismiss a motion for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering such a motion, the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom and view them in the light most favorable to the non-moving party." *DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 215 (3d Cir. 2007) (quoting *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989)).

Except as provided in Fed. R. Civ. P. 9, a complaint is sufficient if it complies with Fed. R. Civ. P. 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a)(2) does not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550

---

[2] The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1367. "When a district court[]… hears a state-law claim based on its supplemental jurisdiction … the court must determine whether … a matter is substantive or procedural. *Chin v. Chrysler LLC*, 528 F.3d 272, 278 (3d Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Simmons v. City of Phila.*, 947 F.2d 1042, 1085 (3d Cir. 1991)). Here, Fed. R. Civ. P. 12(b)(6) procedure and standard are guided by federal law. *Id.* The state-law claims falling under this Court's supplemental jurisdiction are substantive and the court should therefore apply the law of Pennsylvania. *See Am. Stores Props., Inc. v. Spotts, Stevens &McCoy, Inc.*, 648 F.Supp.2d 707, 712 (E.D. Pa. 2009).

U.S. 544, 570 (2007). The requirement that a pleading contain a short and plain statement of a claim showing that the pleader is entitled to relief does not require detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Although "conclusory" or "bare-bones allegations" will not survive a motion to dismiss, a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits. *Id*., at 210; *See also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). A well-plead complaint should not be dismissed simply because "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. Finally, in deciding a Rule 12(b)(6) motion, the Court limits its inquiry to the facts alleged in the complaint and its attachments, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Here, the Complaint alleges that Jeld-Wen is engaged in the business of manufacturing, selling and distributing windows and/or window components. *See* **Exhibit B**. The Complaint also alleges that Tague lumber is engaged in the business of selling and/or distributing windows and/or window components. *See* **Exhibit B**. The Complaint further alleges that the windows manufactured by Jeld-Wen and sold by Tague were defective, unreasonably dangerous, and were the cause and/or contributed to the damages alleged in MILO's underlying Complaint. *See* **Exhibit B**. Viewing these allegations as true, in the light most favorable to 200 CSP, and drawing all reasonable inferences from them, 200 CSP has alleged sufficient facts to establish its right to relief. For those reasons, defendants Rule 12(b)(6) motion must be denied.

> **B.    Claim Preclusion Does Not Bar 200 CSP's Claims for Negligence, Strict Products Liability, and Breach of Implied Warranty Because Defendants**

**Have Failed To Satisfy The Three Requirements Necessary For Claim Preclusion To Apply.**

Defendants' assertion that claim preclusion requires dismissal of multiple counts of the complaint is without merit because defendants have failed to show the concurrence of the three conditions required before claim preclusion can apply. Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action. *Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra*, 983 F.2d 495 (3d Cir. 1992).

In their motion, defendants state "[The Klehr Court] rendered a final judgment on the merits of [200 CSP]'s negligence, strict liability, and breach of implied warranty claims." However, there can be no final judgment on the merits for claims that have been dismissed when the underlying litigation is still pending, as it is in the *Klehr* litigation. It is well settled in Pennsylvania that an appeal will lie only from a final order unless otherwise permitted by statute; a final order is one which ends the litigation or disposes of the entire case. *Praisner v. Stocker*, 459 A.2d 1255, 1258 (Pa. Super. 1983). Generally, an order which dismisses some but not all counts of a multi-count complaint is interlocutory and not appealable. *Giannini v. Foy*, 421 A.2d 338 (Pa. Super. 1980). Conversely, an order is interlocutory and not final unless it effectively puts the litigant out of court. *Id*., at 339 (citing *Allessandro v. State Farm Mutual Auto. Ins. Co.*, 409 A.2d 247 (Pa. 1979).

In the *Klehr* litigation, the Court issued an Order dated August 16, 2018 dismissing three counts of 200 CSP's Complaint filed against defendants. *See* **Exhibit D**. However, the Order also permitted 200 CSP to file an Amended Third-Party Complaint, which has subsequently been filed, and, more notably, did not dismiss all the counts within the complaint. *See* **Exhibit D**. Because litigation is still pending in the *Klehr* litigation there has been no final judgment on the merits, therefore claim preclusion is not applicable in the present matter.

Further, the matter before the court is not a subsequent suit based on the same cause of action. The focus for determining what constitutes a "cause of action" is fact driven and the Court must determine whether there is "essential similarity of the underlying events giving rise to various claims[.]" *Davis v. United States Steel Supply*, 688 F.2d 166, 171 (3d Cir. 1982). As previously noted, the *Klehr* litigation stems from construction issues with a home owned by the Klehrs located at 507 South 12th Street in Philadelphia. *See* **Exhibit C**. The matter before this Court stems from issues with a home owned by MILO located at 501A South 12th Street in Philadelphia. *See* **Exhibit C**. The litigation in these two cases involve two separate properties and two separate owners. The litigation in both cases is factually separate and therefore not based on "the same cause of action." For the reasons stated above, claim preclusion is not an available to defendants and their motion should therefore be denied.

C.   **Defendants Assertion That Collateral Estoppel (Otherwise Referred to as Issue Preclusion) Bars Several of 200 CSP's Claims Is Without Merit As Defendants Have Failed To Satisfy The Requirements For The Doctrine To Apply.**

Defendants have failed to show that the economic loss doctrine, gist of the action doctrine and the validity of their disclaimer of implied warranties have been previously litigated or that these issues were decided on the merits of a final and valid decision. Therefore, collateral estoppel does not preclude 200 CSP from litigating these issues in this separate matter. A party asserting collateral estoppel must prove: (1) the previous determination was necessary to the decision; (2) the identical issue was previously litigation; (3) the issue was actually decided on the merits and the decision was final and valid; and (4) the party being precluded from re-litigating the issue was adequately represented in the previous action. *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006); *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1333 (Fed. Cir. 2004).

Contrary to what defendants assert, there is no evidence to suggest that the court in the *Klehr* litigation dismissed 200 CSP's claims on the basis of the economic loss doctrine, gist of the action doctrine, or that their disclaimer was proper. The order they reference states simply that three counts have been dismissed, but the order provides no reasoning behind their dismissal. *See* **Exhibit B**. Defendants impermissibly ask this Court to speculate as to why the court in the *Klehr* litigation dismissed these counts. Further, as discussed above, the order from the *Klehr* litigation that dismisses three counts of that complaint is not a final and valid decision. Because defendants have failed to satisfy all of the requirements of the doctrine of collateral estoppel, this Court should deny their motion.

### D. 200 CSP's Claims Against Defendants Are Not Barred by the Economic Loss Doctrine or Gist of the Action Doctrine Because Jeld-Weld's Tortious Performance Was Collateral to Its Agreement to Supply Windows and Window Components.

By asserting the economic loss doctrine and gist of the action doctrine, Defendants are attempting to force this Court to prematurely rule on what types of damages MILO, 200 CSP, or any other party may recover in this action. At this early stage in litigation, with discovery barely begun, more facts need to be developed regarding the types of harm suffered by MILO. Until that time, the economic loss doctrine should not be applied to bar any of the Counts contained within the Third-Party Complaint.

Additionally, the gist of the action doctrine does not apply to bar 200 CSP's claims merely because Defendants may have provided a warranty for its windows and window components. The gist of the claim must be determined by locating the duty that was breached. In this case, that duty was a greater duty imposed on Defendants by law, namely to not negligently manufacture and sell windows or window components, as opposed to the mere contractual obligation to supply windows and window components.

For these reasons, explained more fully below, this Court should deny Defendants' motion.

1.   **Economic Loss Doctrine**

Defendants are asking this Court to make a premature determination regarding the type of damages and relief that MILO are entitled to. MILO's First Amended Complaint makes demands for actual, treble, compensatory, punitive, and/or consequential damages "in an amount to be determined at trial" to compensate for generalized alleged harms to MILO and the Home. *See* **Exhibit A**. At this early stage in litigation, it cannot be determined whether MILO seek compensation merely for damage to the Home, or for additional property or personal injuries, as well. As such, Defendants' preliminary objection based on the economic loss doctrine should be overruled.

Generally, the economic loss doctrine bars recovery in tort for commercial parties who purchase defective products that cause damage only to the *product itself. See E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868–72 (1986) (emphasis added). But it does not apply to bar recovery for personal injury or damage to "other property." *See id.*

Discovery in this case has only just begun. As such, MILO's claimed damages have yet to be fully assessed, and it is too early to properly categorize them. While many, but not all, of MILO's allegations refer to the construction, the First Amended Complaint states several times that both MILO and the Home have suffered consequential damage. *See* **Exhibit A**. It is possible that MILO have suffered personal injuries and personal property loss because of the allegedly-defective construction. Therefore, granting Defendants' motion would completely cut MILO, 200 CSP, and other parties off from relief that they may ultimately be entitled to upon the introduction of such evidence.

Defendants argues that the "product itself" in this case is the completed Home and that recovery in tort is foreclosed because the window, a component of the Home, does not qualify as "other property." However, it cites no binding precedent for this proposition. Other federal district court cases not cited by Defendants, but just as persuasive, suggest that components or different areas of a completed home may qualify as "other property." *See, e.g.*, *Pansini v. Trane Co.*, No. 17-3948, 2018 WL 1172461 (E.D. Pa. Mar. 6, 2018); *Gadley v. Ellis*, No. 3:13-17, 2015 WL 2345619 (W.D. Pa. May 15, 2015).

For example, in *Gadley v. Ellis*, the plaintiff's motion for reconsideration was granted to permit the plaintiff to introduce evidence of water damage to various areas of his home after the defendant's motion for partial summary judgment was granted on the basis of the economic loss doctrine. *See Gadley*, 2015 WL 2345619, at *4. The court stated that newly acquired evidence of damage to the home's timber frame, walls, ceilings, floors, and contents resulting from the defective roof panels could establish damages that fall outside of the "product itself" limitation. *See id.* at *5. In *Pansini v. Trane Co.*, while holding that recovery in tort for a "faulty HVAC unit causing homeowners to hire a technician" was barred by the economic loss doctrine, the U.S. District Court for the Eastern District of Pennsylvania stated that the *Gadley* court had correctly determined that other areas of a home or the personal property therein fall outside of the "product itself" when dealing with houses. *See Pansini*, 2018 WL 1172461, at *5 ("A faulty HVAC unit causing homeowners to hire a technician is a far cry from . . . leaky roof panels causing water damage inside a home . . . ." (citing *Gadley*, 2015 WL 2345619, at *6)).

As in *Gadley*, the record in this case needs to be developed further before the economic loss doctrine can be said to bar recovery in tort. It is not clear (1) that MILO is claiming only damage to the home or (2) that various components or areas of the Home do not qualify as "other

property." There is currently too much uncertainty regarding the nature of the damages, and Defendants' motion should be denied.

### 2.  Gist of the Action Doctrine

200 CSP's negligence and strict products liability claims are not barred by the gist of the action doctrine because the alleged torts were collateral to the performance of any contract. This analysis is undertaken with the knowledge that because the discovery process is in its early stages, the exact language of any contract between 200 CSP and Defendants is unknown. Therefore, the gist of the action doctrine is unavailable to defendants at this stage. If, however, this court were to find that such a contract existed, then the gist of the action doctrine would still not preclude 200 CSP's claims against Defendants.

The touchstone for the gist of the action analysis is the duty-based framework explained by the Pennsylvania Supreme Court in *Bruno v. Erie Insurance Co. See* 106 A.3d 48, 63 (Pa. 2014); *see also Dommel Props. LLC v. Jonestown Bank and Tr. Co.*, 626 F. App'x 361, 365 (3d Cir. 2015). The mere fact that a contractual relationship brought two parties together does not automatically result in a tort claim being disqualified under the gist of the action doctrine. *See Bruno*, 106 A.3d at 57.

The nature of the duty is determinative, and the issue is whether the defendant has breached some specific duty imposed solely because of the contract or a more general duty imposed by law. *See id.* at 68; *Harleysville Homestead Inc. v. Lower Salford Twp. Auth.*, 980 A.2d 749, 753 (Pa. Cmwlth. 2009). When the defendant has tortuously performed the contract, the contract is merely the vehicle that established the relationship between the two parties. *See Bruno*, 106 A.3d at 70 (quoting *Meyer v. Cmty. College of Beaver Cty.*, 965 A.2d 406, 411 (Pa. Cmwlth. 2009), *vacated on other grounds*, 2 A.3d 499 (Pa. 2010)).

Pennsylvania state courts have previously approved of reasoning that would permit negligence and fraud claims to survive preliminary objections based on the gist of the action doctrine despite the existence of a contract. *See Honeywell Int'l Inc. v. Archdiocese of Phila.*, No. 2219 (Phila. Cty. Ct. C.P. Oct. 24, 2001) (citing *Grode v. Mutual Fire, Marine, and Inland Ins. Co.*, 623 A.2d 933, 937 (Pa. Cmwlth. 1993)). In *Grode v. Mutual Fire, Marine, and Inland Insurance Co.*, the Commonwealth Court held that tort claims could survive the gist of the action doctrine when the plaintiff is alleging tortious performance, rather than a failure to perform. *See Grode*, 623 A.2d at 936. In *Honeywell International Inc. v. Archdiocese of Philadelphia*, the Philadelphia Court of Common Pleas determined the facts to be inapposite to *Grode*, but the court still noted its approval of the reasoning in *Grode*.

Similar to *Grode*, 200 CSP is not alleging that Defendants failed to perform. Rather, the claim is that Defendants acted tortiously. The duty breached was not one imposed by the warranty Defendants claim applies. The duty breached was a more general duty that Defendants have to refrain from negligently manufacturing and selling windows or placing windows into the stream of commerce that pose unreasonable risks to foreseeable users.

**E.     The disclaimer of warranties discussed at length in defendants' Rule 12(b)(6) motion is not integral to or explicitly relied upon in 200 CSP's complaint and they should be excluded from this Courts consideration of defendants' Rule 12(b)(6) motion.**

In deciding a Rule 12(b)(6) motion, the Court limits its inquiry to the facts alleged in the complaint and its attachments, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents. *See Jordan*, 20 F.3d at 1261 (3d Cir. 1994); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). "A document integral to or explicitly relied upon in [a] complaint may be considered

without converting the motion to dismiss into one for summary judgment." *Schmidt v. Skolas,* 770 F.3d 241, 245 (3d Cir. 2014).

Defendants assert that the "Jeld-Wen Warranty" and "complete Tague Terms and Conditions and Warranty" (the "Warranties") are documents integral to the complaint and must therefore be considered in the context of their motion to dismiss. Implicit in this argument is the notion that the Warranties are both applicable to any commercial transaction that occurred between 200 CSP and defendants, and that these Warranties are legally sufficient. However, the complaint does not claim that a written warranty was violated. *See* **Exhibit B.** The complaint's only reference to a warranty is the allegation relating to a warranty of fitness for an ordinary purpose. *See* **Exhibit B.**

Moreover, although the Defendants detail the contents of the disclaimers contained within the Warranties at length, they fail to assert that these warranties were applicable to the commercial transaction between 200 CSP and defendants. At this stage, this Court is tasked with reviewing the complaint under the familiar *Twombly* and *Iqbal* standards. 550 U.S. 544; 556 U.S. 662. The question here is whether, after accepting as true all allegations in the complaint along with all reasonable inferences which can be drawn from them, 200 CSP has pleaded enough facts to state a claim to relief that is plausible on its face. *Twombly,* 550 U.S. at 570. Defendants are essentially asking this Court to incorporate into the complaint a warranty that is not referenced -and then find both that this warranty is enforceable against 200 CSP and that the disclaimer contained within this warranty requires dismissal of plaintiff's claims. What defendants are asking this Court to consider is outside the scope of a 12(b)(6) motion and their motion should therefore be denied.

   **F.     200 CSP's Common Law Indemnification and Contribution Claims Are
           Proper Because Defendants and Hague Lumber are Either Solely or Jointly
           Liable for the Klehr Injuries.**

In Pennsylvania, common law indemnity is available for any liability sounding in tort. *EQT Prof. Co. v. Terra Servs., LLC,* 179 F.Supp.3d 486 (W.D. Pa. 2016). Common law indemnity "shifts the entire loss from one who has been compelled, by reason of some legal obligation, to pay a judgment occasioned by the initial negligence of another who should bear it." *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2 850, 854 (Pa. 1997). Indemnity is granted where the "community opinion would consider that in justice the responsibility should rest upon one rather than the other." *Id.* The Pennsylvania Superior Court has found common law indemnification for the seller of a dump truck against the manufacturer of that dump truck's tailgate assembly where the tailgate malfunctioned and caused the death of another individual. *Walasavage v. Marinelli*, 483 A.2d 509, 512 (Pa. Super. 1984).

In Pennsylvania, contribution is available for joint tortfeasors to ensure that each individual pays for an equitable share of their liability for the harms produced. 42 Pa.C.S.A. § 8324. The Pennsylvania Contribution Among Joint Tortfeasors statute defines joint tortfeasors as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." 42 Pa.C.S.A. § 8322. In determining "whether the harm to a plaintiff is capable of apportionment, that is, whether the defendants are separate or joint tortfeasors," courts consider several factors: the identity of a cause of action against each of two or more defendants; the existence of a common, or like duty; whether the same evidence will support an action against each; the single, indivisible nature of the injury to the plaintiffs; identity of the facts as to time, place or result; whether the injury is direct and immediate, rather than consequential; responsibility of the defendants for the same injury as opposed to the same act. *Voyles v. Corwin,* 441 A.2d 381, 383 (Pa. Super. 1982) and *Harka v. Nabati,* 487 A.2d 432, 434 (1985), both citing Prosser, Law of Torts, § 46 n. 2 (4th Ed. 1971).

In *Smith v. Pulcinella*, the Court examined these factors in a situation involving a multi-car crash. 656 A.2d 494, 495 (Pa. Super. 1995). In that case, Smith's car was struck from the rear by Pulcinella's car. *Id.* A police officer arrived and both cars were placed on the shoulder of the road. *Id.* Soon after, a third car struck Pulcinella's car in the rear, forcing it into Smith's car for the second time. *Id.* The Court found that Pulcinella and the third driver were joint tortfeasors. *Id.* at 498. In evaluating the factors for contribution, the Court highlighted that the duty of care owed by Pulcinella and the third driver Smith was identical, and both were negligent in an identical fashion and at almost the same time and place in failing to control their vehicles in rainy weather conditions. *Id.* at 497. Additionally, the harm caused to Smith was single and indivisible, with Smith's medical expert being unable to differentiate between injuries sustained on first impact and injuries on second impact, and Smith would not have been in position to be struck by second vehicle but for defendant's negligence. *Id*; s*ee also Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1028 (Pa. Super. 2005) (Finding a car dealership and third-party lender to be jointly liable under the Unfair Trade Practices and Consumer Protection Law for selling the plaintiff a stolen car because of the third-party lenders "inexcusable" failure to comply with required finance procedures).

Given the high bar to grant a 12(b)(6) motion, 200 CSP has alleged sufficient facts to substantiate its claims for common law indemnification and contribution. It is not "clear" that 200 CSP will be unable to prove facts that will sustain its burden to demonstrate indemnity and contribution. Following the *Walasavage* case, manufacturers can be held to indemnify those consumers harmed by their negligently constructed products. *Walasavage,* 483 A.2d at 512. The pleaded facts allege that Defendants manufactured and sold the defective windows which were installed in the MILO home, which subsequently caused water damage in the Home. *See* **Exhibit A**. 200 CSP did not undertake any construction work on the MILO home and did not alter or install

the windows. Based on those allegations, Defendants can be held solely responsible for MILO's purported negligence claim. MILO brought claims against 200 CSP instead of Defendants such that 200 CSP is facing potential liability for damages that they did not cause. That is the precise problem for which common law indemnification was enacted to remedy.

Alternatively, if this Court finds that 200 CSP is liable for damages MILO alleges, Defendants shares in that liability over and above that of 200 CSP as stated above. Applying the factors for contribution from the *Voyles* case, there is a single, indivisible injury of water damage suffered by MILO at their home due to the defective windows that were installed. That water damage is alleged to have been caused by 200 CSP, but Defendants' defective windows in fact caused the damage. Likewise, the facts regarding time, place, and result of the alleged negligence are common as to 200 CSP and Defendants because both parties are alleged to have been negligent in their duties to MILO to ensure their home complied with the applicable building codes and standards. Although 200 CSP denies any liability for MILO's damages, the same evidence supporting MILO's negligence claims against it will support a claim against Defendants. Furthermore, the injury of water damage is common as to both 200 CSP and Defendants. Despite Defendants' attempts to avoid liability for its defective windows, Defendants are at least partially liable for the damages suffered by MILO. 200 CSP's contribution claim against Defendants is therefore proper.

Defendants rely on the *Preferred Contractors Ins. Co., RRG, LLC v. Sherman* case to support its contention that indemnification and contribution claims cannot support the third-party of a defendant if there are no other accompanying claims. __A.3d__,__(Pa. Super. 2018) (slip op. at *10), decided on July 24, 2018. In the *Preferred* case, the insurer, Preferred Contractors Insurance Company ("PCIC") sought to disclaim coverage for damages stemming from their general contractor insured, Sherman. *Id.* at 1. The insured engaged an insurance broker, the Brown

Agency, who PCIC alleged was negligent in its handling of the insurance policy application. PCIC also alleged contribution and indemnity claims. *Id.* at 3. The Pennsylvania Superior Court, after discovery ended, dismissed the negligence claims, and as such there was no underlying tort for which to hold the Brown Agency liable. *Id.* at 10.

Central to the Court's reasoning was the fact that no other claims underpinning the indemnification and contribution were pleaded against the defendant sought to be joined. *Id.* The factual situation in *Preferred* is distinguishable from the instant situation because MILO's negligence claim against 200 CSP undergirds the common law indemnification and contribution alleged against Defendants. Furthermore, the negligence claim was only denied after discovery had ended, so the Court was well apprised of the evidence that could or could not support its contribution and indemnity claims.

For those reasons, Defendants' motion should be denied.

### G.     Defendant's Argument That 200 CSP Has Attempted to Shift The Burden of Proof Is Untimely For a Fed. R. Civ. P. 12(b)(6) Motion.

Defendants incorrectly state that 200 CSP is attempting to shift the burden of proof in order to force defendants to "exculpate themselves." This argument is both erroneous and untimely for a F.R.C.P. 12(b)(6) motion because "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). In determining whether a complaint is sufficient, the court must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209 (3d Cir. 2009).

Defendant's reliance on *Pennfield Corp v. Meadow Valley Electric Co.* is misplaced. 604 A.2d 1082 (Pa. Super. Ct. 1992). There, Pennfield Corp. alleged that a faulty electrical cable in a

ventilation system had caused the death of several pigs they owned. *Id.*, at 1083. In the complaint Pennfield Corp. alleged that they had obtained the electrical cable responsible for the failed ventilation system from *either* Meadow Valley Electric Company *or* Tri-State Electrical Supply. *Id.* (emphasis added). The court rejected this "alternative liability" approach, finding that plaintiff was essentially requiring both defendants to prove that they were not culpable. Here, 200 CSP leaves no doubt as to who manufactured and sold the defective windows. There is no allegation that more than one window manufacturer or distributor may be possible for the defective windows. Therefore, the Court's holding in *Pennfield Corp. v. Meadow Valley Electric Co.* is inapplicable to the present matter.

Contrary to defendants' assertion, 200 CSP has pleaded sufficient factual matter, which if accepted as true, states a claim to relief that is plausible on its face. *See* **Exhibit B.** Plaintiffs allege that Defendants manufactured the defective windows that were used in the construction of the Home, that Tague sold the defective windows that were used in the Home and that the defective windows caused the harm alleged by MILO in the underlying complaint. *See* **Exhibit B.** After taking these factual allegations as true and viewing them in the light most favorable to 200 CSP, it is apparent that 200 CSP may be entitled to relief. Defendants' argument is untimely and outside the scope of what is considered by a court reviewing a Fed. R. Civ. P. 12(b)(6) motion and their motion should therefore be denied.

## VI.   **RELIEF**

For the foregoing reasons, Robertshaw respectfully moves this Honorable Court for an order that: (A) DENIES Defendants JELD-WEN, INC. and TAGUE LUMBER OF MEDIA, INC.'s Motion to Dismiss the Third-Party Complaint; and (B) grants such other, further and different relief as this Court deems just and proper.

Dated: Philadelphia, PA
      October 29, 2018

WADE CLARK MULCAHY LLP

*/s/ Robert J. Cosgrove*

_____
By:  Robert J. Cosgrove, Esq.
     Attorney ID #204665

*/s/ Alexandra M. Perry*

_____
By:  Alexandra M. Perry, Esq.
     Attorney ID #319072
     1515 Market Street, Suite 2050
     Philadelphia, PA 19102
     Attorneys for Third-party Plaintiffs
     WCM #812.10240

# EXHIBIT A



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MILO, LLC** | : |
| | : |
| *Plaintiff* | : |
| | : |
| v. | : |
| | : |
| **VIRGIL PROCACCINO,** | : |
| **ARTHUR ELWOOD, and** | : |
| **200 CHRISTIAN STREET PARTNERS** | : |
| | : |
| | : |
| *Defendants* | : |
| | : |

Civil Action No.: 16-cv-5759

**FILED**

JAN 3 0 2017

**KATE BARKMAN,** Clerk
By _____ Dep. Clerk

## FIRST AMENDED COMPLAINT

Plaintiff MILO, LLC ("MILO") by and through its attorneys, Bochetto & Lentz, P.C. ("B&L"), avers as follows in support of its Complaint against Defendants Virgil Procaccino ("Procaccino"), Arthur Elwood ("Elwood") and 200 Christian Street Partners ("200 CSP") ("collectively the "Defendants").

## I.    NATURE OF THE ACTION

1.      This case is brought primarily under the Pennsylvania Unfair Trade Practices and Consumer Protection Law regarding Defendants' fraudulent building, marketing, and selling to Plaintiff MILO an unsafe and defectively constructed home priced at almost ***$2,000,000***.

2.      David and Beth Ferreira are the parents of two young children – a 2-month old newborn and a 20-month old toddler at the time – who sought to occupy the newly-constructed home located at 501A South 12th Street ("the Home") with the intention of raising their family

(the "Ferreiras") in the City of Philadelphia and experiencing all that city life has to offer for young families.

3.     MILO owns the Home for the benefit of the Ferreiras' children and at all times material David Ferreira acted as an agent of MILO in negotiating the purchase of the Home.

4.     Procaccino and Elwood own and operate Defendant 200 CSP for the purpose of building and selling luxury homes in the City of Philadelphia, and were responsible for the construction of the Home.

5.     Procaccino and Elwood specifically focus their marketing on the "$1 million-plus market" by touting "'the wow factor'" of their homes and expressly representing that they do not "skimp" on construction.  (*See* Exhibit A, August 18, 2014 Philadelphia Inquirer Article "Center City residential developers build on the 'wow' factor.")

6.     The Defendants – by and through representations made individually by Procaccino and Elwood – directly represented to David Ferreira and MILO that the Home was not only designed and built according to applicable building codes, but was constructed according to best standards in the industry, and according to the architectural drawings presented to David Ferreira and MILO.

7.     These representations were materially false.

8.     In reliance upon Defendants' representations, David Ferreira caused MILO to purchase the Home for $1,955,000.

9.     In making the decision to purchase the Home from Defendants, MILO reasonably relied on the express and implied representations of quality, workmanship and the promises of full compliance with all applicable building codes and industry standards.

2

10.     As actually constructed, the Home was so riddled with safety hazards and construction defects that the Ferreiras could not live there without risk to their health and safety, and as a result, shortly after moving into the Home, the Ferreiras were forced to relocate in November 2015, and seek ongoing medical advice to monitor the respiratory problems that their newborn child experienced while living in the Home.

11.     As a result of these significant defects and safety hazards, MILO has sustained and continues to sustain the following ongoing damages:

> i.   Ownership of a Home in need of profound remediation;
> ii.  Diminution of the value of the Home, and perhaps the reality that they may never be able to sell the Home;
> iii. Significant and ongoing professional inspection, engineering and remediation fees;
> iv.  Both temporary and permanent relocation costs; and
> v.   Attorneys' fees and costs of suit.

## II.     PARTIES

12.     Plaintiff, MILO LLC., is a limited liability company formed in Delaware that has a registered office at 1600 Greentree Drive, Suite 101, Dover DE 19904.  MILO is the record owner of the Home, for the benefit of David and Beth Ferreira's children.

13.     Defendant, 200 Christian Street Partners, is a limited liability company formed in Pennsylvania and may be served at 2320 South Street, Philadelphia, PA 19146.

14.     Defendant, Virgil Procaccino, is an individual who may be served at 2320 South Street, Philadelphia, PA 19146.  Procaccino is a partner in 200 CSP and individually made many of the fraudulent representations directly to Plaintiff MILO and David Ferreira.

3

15.     Defendant, Arthur Elwood, is an individual who may be served at 2320 South Street, Philadelphia, PA 19146.  Elwood is a partner in 200 CSP and individually made many of the fraudulent representations directly to Plaintiff MILO and David Ferreira.

## III.     JURISDICTION & VENUE

16.     This matter is properly filed in this District, as there is complete diversity between Plaintiff and Defendants.

17.     The amount in controversy exceeds the sum of $150,000, exclusive of interest fees and costs.

18.     Jurisdiction is asserted pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff MILO, LLC, a citizen of  the State of Delaware and all Defendants, who are citizens of the Commonwealth of Pennsylvania.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as a substantial number of acts giving rise to this claim occurred in the Eastern District of Pennsylvania.

20.     This Court has both general and specific personal jurisdiction with respect to all Defendants.

## IV.     FACTS COMMON TO ALL COUNTS

### A.  The Sale of the Home.

21.     David Ferreira and his wife Beth are a married couple with two young sons, ages 20 months, and 2 months at the time that the Ferreiras moved into the Home.

22.     MILO is a limited liability company created solely to purchase and hold assets in trust for David and Beth Ferreiras' children.

4

23.     In or about 2014, MILO authorized David Ferreira to look for a new home in the City of Philadelphia to serve as the residence of the Ferreiras.

24.     MILO specifically sought a home that would allow the Ferreiras to live and raise their children in the City of Philadelphia, as well as being MILO's sole asset for the benefit of the Ferreiras' children.

25.     Living in Philadelphia was particularly important as a result of Beth Ferreira's former career as a homicide prosecutor and Assistant Chief in the City's District Attorney's office, and David Ferreira's work in finance at a Philadelphia-based firm.

26.     MILO and the Ferreiras specifically sought to purchase a newly constructed home that would not require any repair or rehabilitation and would not contain any defects that would necessitate expensive remediation or interruption in the raising of the Ferreiras' two children.

27.     Defendants routinely and regularly represented themselves to the public as high-end builders of homes in the "$1,000,000 plus market" in Philadelphia, which was the market MILO and the Ferreiras were interested in.

28.     Approximately three months before MILO purchased the Home, Procaccino and Elwood were interviewed by the Philadelphia Inquirer, during which they touted their superior homes, including the "wow factor" of the design, and publicly represented that they do not "skimp" on the construction or materials.  (*See* Exhibit A.)

29.     Defendants expressly represented to David Ferreira and MILO that that the design and construction of the home was of extremely high quality and according to best-standards in the industry, and that any minor defects in the Home would be remediated prior to closing.

30. As a result of these representations, on or about November 11, 2014, David Ferreira entered into an Agreement of Sale for the purchase of the Home. (*See* Exhibit "B," the Agreement of Sale.)

31. The Agreement of Sale was expressly assignable by him.

32. Thereafter, David Ferreira assigned the Agreement of Sale to MILO.

33. MILO made settlement on the Home on January 15, 2015.

34. The Ferreiras moved into the Home in March 2015.

35. As detailed below, despite Defendants representations of superb quality, workmanship and design – including the "wow" factor – Defendants failed to build a home that complied with even basic building codes and minimally accepted standards of workmanship and construction.

36. The Agreement of Sale attempts to disclaim all implied warranties, but such a disclaimer is void under Pennsylvania law for public policy reasons, as there was absolutely no discussion or negotiation regarding the important legal ramifications of any purported renunciation of MILO's implied warranty rights, or contradiction of all its marketing representations. (*See Tyus v. Resta*, 476 A.2d 427, 328 Pa.Super.11 (1984); *see also Bennet v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145 (Pa.Super. 2012).)

37. Accordingly, regardless of any purported and unenforceable disclaimer, Defendants owed Ferreiras the implied warranties of: 1) a safe and habitable structure, free of faulty materials; 2) construction in a workmanlike manner; 3) construction according to sound building and engineering standards; and 4) compliance with all applicable building codes.

38. As a direct and proximate result of Defendants' actions, MILO incurred significant damages as more fully described below.

6

**B. Water Penetration Problems Commence.**

39.     The Home began experiencing serious problems with water infiltration prior to the settlement of the Home.

40.     During a walkthrough inspection of the property prior to settlement the Ferreiras identified a leak in the master bedroom and reported it to the Defendants.

41.     Procaccino expressly assured the Ferreiras that the issue was minor, and that they would fix the leak in the master bedroom and remediate the water damage.

42.     Procaccino further represented that the leak was isolated to the master bedroom. The initial remediation work was added as a condition of settlement to an addendum to the Agreement of Sale.  (*See* Exhibit C, October, 28, 2014 Addendum.)

43.     Based on such express assurances by Procaccino – particularly that the issue was minor and isolated to the bedroom – the Ferreiras agreed to proceed with Settlement.

44.     As it turned out, such representations by Procaccino were utterly false, and Procaccino knew or should have known that the leak in the master bedroom was caused by major defects in the building envelope that allowed moisture to seep into the Home..

45.     Immediately after settlement on the Home, the Ferreiras discovered a leak in the unfinished basement and reported it to Defendants.

46.     Procaccino agreed to repair the cause of the water infiltration and both Procaccino and Elwood expressly represented that they would "make it right."

47.     Further, both Procaccino and Elwood represented that the basement leak was repaired and would not reappear..

48.     At no time did Defendants reveal to Plaintiff or the Ferreiras that the cause of either incident of water infiltration was the defective construction of the Home.

49.     As a result, Defendants lulled Plaintiff and the Ferreiras into believing the initial water infiltration in the master bedroom had been repaired.

50.     However, in February 2015, immediately prior to the Ferreiras moving into the Home, the Ferreiras discovered a mushroom fungus growing out of the floorboards in the second-floor bedroom that was meant for occupation by their then twenty-month old son.

51.     The Ferreiras were alarmed at the presence of fungal growths in the Home, let alone in the room in which a child was expected to sleep.

52.     Again, Defendants represented to the Ferreiras that the mushroom was caused by a limited problem with the bedroom window and represented that Defendants repaired the limited problem.

53.     Procaccino expressly represented that he, Elwood and 200 CSP would ensure that the bedroom window would be repaired and that any fungal growth would be properly remediated.

54.     Once again, Procaccino also expressly represented that the moisture intrusion was isolated and would not re-appear.

55.     Defendants did not reveal that the cause of the fungal growth was water infiltration from the defective construction of the Home.

56.     Plaintiff and the Ferreiras relied on Defendants representations that the fungal infestation had been fully remediated and would not re-occur.

57.     Despite Defendants' representations that the cause of the moisture and water infiltration had been repaired, the Home continued to experience water infiltration which caused fungal and microbial growths.

8

58. Almost immediately after the Ferreiras moved into the Home, further evidence of infiltration began to appear.

59. The water infiltration in the master bedroom reoccurred in and around the Parallam beam, and a further leak began in a second area in the ceiling of the master bedroom.

60. This water infiltration resulted in two open cavities in the Ferreiras' master bedroom ceiling that have not been closed to date.

61. The Ferreiras again immediately notified Defendants in writing of the infiltration.

62. Defendants again stated they would fix the water infiltration, and shortly thereafter Procaccino expressly represented to the Ferreiras that the sole cause of the infiltration was repaired and that the problem had been isolated to the master bedroom. At no time did Defendants inform MILO that the water infiltration would continue or that its cause could not be repaired without significant remediation throughout many other areas of the Home.

63. At no time did Defendants inform MILO or the Ferreiras that the water infiltration was the result of significant construction defects or a failure to follow design specifications.

64. MILO relied on Defendants' express representations that Defendants had cured the cause of the infiltration.

65. In the spring of 2015, after the reoccurrence of the master bedroom leak, Procaccino, Elwood, and the Ferreiras all met at the Home to discuss the moisture infiltrations.

66. At that meeting, Procaccino and Elwood both expressly represented that the leaks in the Home were isolated incidents, and that Procaccino, Elwood and 200 CSP were committed to repairing those leaks.

67. Procaccino and Elwood knew or should have known that these statements were false.

9

68.     At that meeting, Procaccino and Elwood failed to disclose that the water infiltration was a direct result of Defendants' failure to build the Home to code with an effective moisture-barrier.

69.     Plaintiff and the Ferreiras relied on those representations and omissions.

70.     In July of 2015, after returning from summer vacation and four months after the water infiltration had supposedly been completely remediated in both the master bedroom and the second-floor children's bedroom, the Ferreiras discovered a second mushroom fungus growing out of the wall of their child's bedroom. (See Exhibit "D", July 2015 Photograph of Mold Mushroom.)

71.     This fungus posed a danger to the health of the Ferreiras' young children.

72.     In fact, from the moment that mushroom was discovered, the Ferreiras' children never slept in that room again.

73.     The Ferreiras were distraught at the presence of a large mushroom in their children's bedroom growing in the exact same place as the previous mushroom had appeared.

74.      The Ferreiras immediately contacted Defendants regarding the mushroom and the on-going water infiltration.

75.     Again, Defendants purported to inspect the Home, represented that the water infiltration was the result of a limited issue with a bedroom window, and purported to "repair" the issue.

76.     Procaccino and Elwood individually represented to Beth Ferreira that the entire window – including the sash – would be replaced to ensure that the mushroom would not reoccur.

10

77.     Even this limited representation of the fraudulent repair was false, as Defendants did not replace the sash and instead chose to replace only the glass windows (which were under warranty by the manufacturer, thereby avoiding any direct costs to themselves) and did not in any way address the window sash, frame or adjacent wall behind which the water had collected.

78.     In fact, shortly after Procaccino represented to Beth Ferreira that the sash would be replaced, she overheard him telling a contractor for 200 CSP that they ***would not be replacing the sash at all.***

79.     Accordingly, at the time this representation was made, Procaccino and Elwood knew that it was false.

80.     Throughout 2015, Ferreiras repeatedly asked the Defendants to provide a plan of action, full scope of work for the remediation process and a timeline in which the work would be completed.

81.     At no time did the Defendants ever furnish a plan, scope of work or timeline to the Ferreiras with regards to the multiple issues now identified throughout the Home.

82.     At no time after the second mushroom appeared did Defendants inform the Ferreiras or MILO that the building envelope was thoroughly compromised or that the "repair" they effected could not stop the continued water infiltration into the Home.

83.     Instead, Defendants – including Procaccino and Elwood individually – continued to fraudulently lull the Ferreiras into believing the limited repairs had completely remediated the water infiltration problem which had caused the growth of multiple fungi inside the Home.

84.     In or about July 2015, the Ferreiras hired an independent home inspector to conduct a moisture infiltration assessment of the Home.

11

85.     In addition, the Ferreiras hired a mold inspector to monitor the presence of mold in the Home.

86.     The Home was inspected and tested for mold on multiple occasions between March 2015 (after the discovery of the first fungal mushroom growth) and November 2015.

87.     In November the mold inspector discovered the presence of mold in the Home, giving the Ferreiras no choice but to evacuate the Home.

88.     The Ferreiras then sought further opinions by hiring a forensic water penetration and microbial growth expert to conduct a review of the home.

89.     The result of these inspections was devastating: the Home was rife with construction defects that were causing structural damage and massive water infiltration.

90.     The water infiltration was so extensive that when an exterior brick wall was punctured at the second floor level as part of the inspection, water was retained so high in the wall cavity that it shot out onto the street.

91.     Despite Defendants' representations that the causes of the water infiltration throughout the home had been repaired, it was now clear that significant additional water infiltration had occurred throughout other parts of the Home, causing internal damage that was not immediately apparent to MILO or the Ferreiras at the time all previous issues mentioned above, had surfaced.

92.     Such water infiltration issues are currently on-going, have never been adequately repaired, and are causing ongoing damage to the Home.

93.     In fact, on or about September 10, 2015 water infiltration re-occurred in the master bedroom, months after Defendants had assured Plaintiff and the Ferreiras that the leaks in the master bedroom had been fully repaired.

12

94.     Not only had Defendants assured Plaintiff and the Ferreiras that the master bedroom water infiltration had been repaired, Defendants pressured the Ferreiras to seal the cavity that had been opened to "repair" the water infiltration, despite that Defendants knew the root cause of the water infiltration was not repaired.

95.     Defendants' multiple representations about the appropriate "fix" purposefully lulled MILO and the Ferreiras into believing that the necessary repairs had been made.

96.     The independent inspection further revealed the Home was *not* built according to industry standards, nor even the minimal requirements of the International Residential Code ("IRC").

97.     Further, the Home was not built according to the design of the architectural drawings advertised on Defendants' website, nor the actual architectural drawings used to obtain the building permits from the City of Philadelphia.

98.     Pursuant to the Uniform Construction Code of Pennsylvania, Pennsylvania expressly incorporates the provisions of the International Residential Code. (*See DRB, Inc. v. Pennsylvania Dep't of Labor & Indus.*, 853 A.2d 8, 11 (Pa. Commw. Ct. 2004) *aff'd*, 585 Pa. 8, 887 A.2d 1216 (2005) *stating that* "the Department and incorporated by reference various model codes, including the International Residential Code . . . [which] applies to the 'construction, alteration, repair, movement, equipment, removal, demolition, location, maintenance, occupancy or change of occupancy of every building or structure which occurs after April 9, 2004.'")

99.     The Northeast Inspection Report conclusively found the Home as built failed to comply with any iteration of the IRC or industry standard.

13

100.     During the latter part of 2015 and through the summer of 2016, the Ferreiras were displaced from the Home, and forced to live in a temporary apartment with only some of the costs borne by Defendants.

101.     Throughout this time Defendants continued to falsely represent they could and would remediate the defects in the Home, but continued to thoroughly obscure and misrepresent the enormity of the defects.

102.     The Defendants directly refused to remediate damage caused to structural beams, plywood and other structural materials that had been exposed to water for years as a result of the numerous construction defects throughout the Home.

103.     Finally, Elwood expressly stated to David Ferreira that he and Procaccino were "not putting any more money into the property."

104.     This admission revealed that despite Elwood and Procaccino's representations that they would "make it right," such representations were false.

105.     This admission also revealed that, while 200 CSP was ostensibly the seller of the Home, Elwood and Procaccino exercised complete dominion and control over 200 CSP, such that they – and only they – could determine whether 200 CSP would remediate the extensive defects in the Home.

106.     Upon information and belief, 200 CSP was specifically formed by Procaccino and Elwood for the purposes of constructing the Home, and other luxury homes on South 12th Street and elsewhere in Philadelphia.

107.     Accordingly, 200 CSP was specifically formed with the intent to protect Procaccino and Elwood from personal liability for any claims arising from their construction of luxury homes in Philadelphia.

14

108.    Procaccino and Elwood understood that 200 CSP was engaging in the business of constructing multi-million dollar homes in an expensive and highly desirable neighborhood in Philadelphia, and as such, Procaccino and Elwood understood that 200 CSP had to be properly capitalized to engage in the construction of such luxury homes.

109.    At a minimum, 200 CSP was required to have sufficient capital to not only build the luxury homes, but also to be able to fund the complete remediation of each home in the event that any of the homes were defectively constructed.

110.    As a result of the sale of the Home, and the other homes on the block, 200 CSP made substantial profits.

111.    Those substantial profits should have been retained as capital by 200 CSP to meet its foreseeable repair and remediation obligations.

112.    Upon information and belief, those profits were stripped out of 200 CSP by Procaccino and Elwood.

113.    Upon information and belief, Procaccino and Elwood took those profits for their personal enrichment knowing 200 CSP would be financially incapable of meeting its repair and remediation obligations.

114.    Upon information and belief, at no time did 200 CSP have any independent or professional management or overseers to act as a check on the abuses caused by the fraudulent conduct of Procaccino or Elwood.

115.    Accordingly, Procaccino and Elwood engaged in a scheme to protect themselves from any liability arising from the defective construction of the Home, while simultaneously siphoning all of the profits and capital earned by 200 CSP from the sale of the Home, and other luxury homes like it.

15

116. As a direct result of Procaccino and Elwood's conduct, 200 CSP is grossly undercapitalized.

117. In refusing to accept the multiple attempts by the Ferreiras to remediate these defects and the damage they have caused, the Defendants abdicated their responsibility to mitigate the damages to MILO and the Ferreiras and left them with no other course of action than to seek protection from this court.

118. In order to determine the full extent of the defects in the home, MILO, by and through the Ferreiras, was forced to retain Rimkus Consulting to assess the structural and architectural integrity of the Home.

119. On September 12, 2016, Rimkus Consulting produced a summary report (the "Rimkus Report") of the construction defects in the Home which identified significant life-safety issues as well as code non-compliance. (*See* Exhibit E, September 12, 2016 Rimkus Report.)

120. These defects were not limited to the water infiltration and building envelope failures, but included structural defects and life-safety risks.

121. Among the most flagrant construction defects noted in the Rimkus Report are the following:

   a. A foundation wall below grade and not to code;
   b. Insufficient wall cavity thickness in the brick veneer due to concrete 'back-filling';
   c. Improper support of the fourth-floor brick veneer on a water-soaked, delaminating and structurally weak Parallam beam;
   d. Deficient brick veneer ties that fail to adequately secure the brick veneer; and
   e. Lack of relief angles for the upper portions of the brick veneer to ensure that the brick veneer does not collapse on itself.

122. These risks are and will continue to be life-threatening to any inhabitants of the Home, until completely remediated.

16

123.    As an example only, the combination of the deficient brick veneer ties and the lack of relief angles makes it a near-certainty that the brick veneer will crack and collapse.

124.    This imminent collapse is exacerbated by the fact that water is building up in the insufficient wall cavity.

125.    This will lead to ice that will expand behind the wall, weaken the already insufficiently secured brick veneer, and ultimately almost certainly cause a collapse onto the public street.

126.    Similarly, the lack of a code-compliant foundation renders the Home structurally unstable.

127.    The mold and water infiltration of the Parallam beam has led to progressive deterioration of that beam.

128.    As a result, that beam has "already experienced a structural strength reduction from its design capacity" and requires immediate remediation.  (The Parallam beam supports the fourth-floor brick wall, and supports the ceiling in the Ferreiras' master bedroom.) (*See* Exhibit E.)

129.    In addition, a comparison of the architectural drawings and the finished Home demonstrates that the Home was not constructed in compliance with those architectural drawings.

**C.  Defendants' Pattern and Practice of Construction of Defective and Faulty Homes.**

130.    The Ferreiras have learned that some of their neighbors have experienced similar water infiltration problems with their homes, which were constructed on the 500 block of S. 12th Street by the Defendants.

17

131.    Many of the homeowners have experienced the same misleading "solutions" and easy "fixes" performed by Defendants on the Home.

132.    Further, upon information and belief, some of the same Homes are afflicted with the same structural and architectural defects.

133.    Defendants have thus acted in a concertedly deceptive fashion over an extended period of time affecting an extensive number of purchasers of residential homes.

### D.   <u>Defendants' Knowledge of the Defects in the Home.</u>

134.    Defendants allegedly constructed the Home in accordance with and pursuant to specified plans and architectural drawings which, among other things, were submitted to the City of Philadelphia in order to secure a building permit.

135.    A review of those plans, however, shows the Home was not constructed in accordance with the architect's designs, and that neither the City of Philadelphia, nor Plaintiff were ever so advised.

136.    In so doing, Defendants – by and through Procaccino and Elwood individually – engaged in significant, but non-apparent, fraudulent cost-cutting measures that resulted in the construction defects in the Home.

137.    By way of limited example, Defendants installed the brick wall without appropriate relief angles.

138.    Such an installation resulted in significantly less construction time, saving Defendants' labor and material costs.

139.    No lay person would know of such cost-cutting measures.

18

140. As a result of Defendants' cost-cutting measures, the brick wall is now in danger of collapse.

141. Similarly, the brick wall was installed without the weep screeds necessary to drain any water that infiltrated the brick wall.

142. Weep screeds are required by the IRC code and are necessary to ensure that water is directed out of any walls it may seep into.

143. Defendants' failure to appropriately install weep screeds rendered the Home vulnerable to the exact damages it sustained, including water infiltration, rotted sheathing, extensive mold growth and the retention of water – under pressure – up to the second floor level.

144. Again, no lay person would know of this construction short-cut.

145. Defendants knew or should have known that the defective installation and attachment of the brick veneer and the failure to install weep screeds would allow water penetration into the construction and cause interior damage to the Home.

146. In addition, Defendants failed to disclose such defects to MILO, despite a duty to make such disclosures at the time of the sale of the Home. (*See* Ex. A at §10(E), Agreement of Sale.)

147. Among other things, MILO relied on the absence of any such disclosures in purchasing the Home.

148. As a direct and proximate result of Defendants' conduct, the Ferreiras were forced to reside in a temporary apartment for almost a year, and have now sought permanent residence outside the City of Philadelphia.

149. Defendants' conduct has significantly diminished the resale value of the Home, as the existence of these defects must be disclosed whenever MILO attempts to re-sell the Home,

19

regardless of what ultimate repairs may achieve, if such repairs are even possible given the extent of the issues set out above.

150.    As such, MILO is unable to sell the Home at any reasonable price as a result of the significant construction defects currently extant.

151.    Plaintiff has attempted serious negotiation/mediation with Defendants and such efforts have been met with deceit, stonewalling and obfuscation, thus making any further negotiation or mediation futile.

152.    Rather than proceeding individually, Procaccino and Elwood instead chose to utilize the limited liability company form of 200 CSP to sell the Home and others like it.

153.    Despite that, Procaccino and Elwood retained sole control over 200 CSP, and made all decisions regarding the construction of the Home, the hiring of sub-contractors, and the subsequent remediation effort and lack thereof.

154.    Upon information and belief, Procaccino and Elwood caused 200 CSP to not engage proper professionals and oversight resources, despite 200 CSP's obligation to do so.

155.    Upon information and belief, Procaccino and Elwood caused 200 CSP to engage unqualified or underqualified sub-contractors to complete the construction, despite knowing such sub-contractors were unable or unwilling to build the Home competently and to code given the amount paid to them by Procaccino and Elwood.

156.    As set forth herein, Procaccino and Elwood routinely and regularly represented that the Home was a luxury construction, and any water-infiltration was minor and isolated.

157.    Procaccino and Elwood knew or should have known that these statements were untrue.

20

158. Such statements were made with the intent that Plaintiff and Ferreiras would rely on those statements, trust that the remediation plans devised by Procaccino and Elwood were sufficient, and ultimately accept such "remediation" without further investigation of the widespread defects in the Home.

159. Plaintiff and the Ferreiras did reasonably rely on these representations and have directly suffered damages as a result, as more fully described elsewhere in this Complaint.

160. Accordingly, Procaccino and Elwood utilized the artificial nature of 200 CSP to perpetuate a fraud.

161. Defendants' actions were outrageous in that they were committed wrongfully, knowingly, oppressively, intentionally, with an evil motive, actual malice, wanton and reckless disregard for the law, gross negligence and/or reckless indifference to the rights of MILO over an extended period of time.

162. Further, Defendants' attempts to cover up and conceal the defects, and their conduct of lulling Milo and the Ferreiras into believing that the repairs completely remediated the water infiltration problems, was intentionally deceitful, outrageous, wanton, and reckless, and demonstrates that any further attempt at mediation would be futile.

## COUNT I
### (VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION PURSUANT TO 73 PS § 201-3, et seq.)
### PLAINTIFF v. DEFENDANTS

163. Plaintiff hereby incorporates all other paragraphs contained in this pleading as though fully set forth herein.

21

164.    The Unfair Trade Practices and Consumer Protection Law ("UTPCPL") was designed to promote full disclosure of information to consumers and to equalize market position and strength of the consumer vis-a vis the seller.

165.    In that regard the UTPCPL requires an expansive reading which reaches unfair and deceptive practices in all consumer transactions.

166.    The UTPCPL has frequently been applied in contracts for the sale of real estate. *See, e.g., Anderson v. Kessler*, 42 Pa. D & C.3d 79 (Ct Comm Pl., 1984); *Skurnowicz v. Lucci*, 2002 WL 922579 (Pa. Super. 2002); *Metz v. Quaker Highlands, Inc.*, 714 A.2d 447 (Pa. Super. 1998).

167.    Defendants are persons as defined pursuant to 73 Pa. C.S.A. §201-2 and engaged in trade or commerce as defined pursuant to 73 P.S. §201-2 .

168.    MILO purchased the Home from Defendants solely for the personal use of Ferreiras.

169.    MILO purchased "goods" which fall under the UTPCPL.

170.    The foregoing misrepresentations constitute deceptive acts and unfair trade practices as defined pursuant to 73 P.S. § 201-2 in direct violation of the Unfair Trade Practices and Consumer Protection Act.

171.    Specifically, Defendants misrepresented that Defendants' "goods" were of a particular character, knowing they were not.  *See* 73 P.S. § 201-2(4)(v).

172.    Defendants misrepresented to MILO that Defendants' "goods" were of a particular standard, quality or grade, knowing they were not.  *See* 73 P.S. § 201-2(4)(vii).

173. Defendants' representations as to the particular character standard, quality and grade of their goods and services constituted a material misrepresentation as the Home actually provided to Plaintiff contained multiple defects which were concealed by Defendants.

174. In addition, Defendants' misconduct and misrepresentations constitutes "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in violation of the UTPCPL. *See* 73 P.S. § 201-2(4)(xxi).

175. MILO justifiably relied on Defendants' misrepresentations when they purchased the Home.

176. MILO and the Ferreiras first discovered the fraudulent and deceptive conduct of Defendants well after closing on the Agreement and moving into the Home.

177. Indeed, the full scope of Defendants' deception was not known until January 2016, when Plaintiff engaged experts to examine and inspect the Home.

178. As a direct and proximate result of Defendants misrepresentations, MILO sustained and will continue to sustain significant damages as described above.

179. As a direct and proximate result of Defendants' misconduct, MILO is also entitled to treble damages, attorneys' fees, and cost of suit.

**WHEREFORE**, MILO demands judgment in their favor and against Defendants 200 Christian Street Partners, Virgil Procaccino and Arthur Elwood jointly and severally, and requests that the Court enter an order:

        a. Awarding MILO actual damages and treble damages, including compensatory, punitive and/or consequential damages, in an amount to be determined at trial;

        b. awarding MILO pre- and post-judgment interest in an amount to be determined at trial; and

        c. awarding MILO such other and further relief as the Court may deem equitable, just and proper, including the award of costs, expenses, reasonable attorneys' fees, reasonable inspection fees, relocation costs, and damages for the diminution

23

of value of the Home incurred by MILO in this action.

## COUNT II
### (BREACH OF CONTRACT)
### PLAINTIFF v. DEFENDANTS

180.     MILO hereby incorporates all other paragraphs contained in this pleading as though fully set forth herein.

181.     Pursuant to the Agreement of Sale, Defendants were obligated to comply with Real Estate Seller Disclosure Law.

182.     The Agreement expressly states that a violation of the Real Estate Seller Disclosure Law allowed MILO "to pursue any remedies that may be available under law or equity." (Ex. A at §28, Agreement of Sale.)

183.     The Real Estate Seller Disclosure Law requires that "[a]ny seller who intends to transfer any interest in real property shall disclose to the buyer any material defects with the property known to the seller . . . ." 68 Pa. C.S.A. § 7303.

184.     Material defects are defined as "a problem with a residential real property or any portion of it that would have a significant adverse impact on the value of the property or that involves an unreasonable risk to people on the property. 68 Pa C.S.A. § 7102.

185.     As set forth more fully above, the Home was rife with defects that have had, and will continue to have, a significant adverse impact on the value of the property, and that involve an unreasonable risk to people on the property.

186.     Defendants knew of these material defects in the Home prior to the sale of the Home and failed to disclose such defects the MILO or the Ferreiras in any manner.

187.     Defendants have breached the Agreement of Sale by their failure to comply with the Real Estate Seller Disclosure Law.

188.     As a direct and proximate result of that breach, MILO has been damaged.

24

**WHEREFORE**, MILO demands judgment in their favor and against Defendants 200

Christian Street Partners, Virgil Procaccino and Arthur Elwood jointly and severally, and

requests that the Court enter an order:

      a.  Awarding MILO actual damages and punitive damages, including compensatory, punitive and/or consequential damages, in an amount to be determined at trial;

      b.  awarding MILO pre- and post-judgment interest in an amount to be determined at trial; and

      c.  awarding MILO such other and further relief as the Court may deem equitable, just and proper, including the award of costs, expenses, reasonable attorneys' fees, reasonable inspection fees, relocation costs, and damages for the diminution of value of the Home incurred by MILO in this action.

## COUNT III
## (BREACH OF IMPLIED WARRANTY)
## PLAINTIFF v. DEFENDANTS

189.    MILO hereby incorporates the all other paragraphs contained in this pleading as

though fully set forth herein.

190.    Defendants impliedly warranted that the Home was:

      i.    Safe and fit for human habitation;

      ii.   Free from construction defects and faulty materials;

      iii.  Constructed in a workmanlike manner;

      iv.  Constructed according to sound building and engineering standards;

      v.   Constructed in accordance with all applicable building codes; and

      vi.  Constructed in accordance with the displayed architectural drawings.

191.    In addition, through the actions of each and every agent, representative and

independent contractors for Defendants, Defendants impliedly and expressly warranted that all

defects complained of would be properly and competently repaired.

192. At all times material, Plaintiff relied on Defendants' representations and warranties.

193. As set forth more fully above, each of these implied warranties were breached:

    i. The Home was not safe and fit for human habitation, as evidenced by the continuous water penetration and mold growth;

    ii. The Home was not free from construction defects and faulty materials;

    iii. The Home was not constructed in a workmanlike manner;

    iv. The Home was not constructed according to sound building and engineering standards;

    v. The Home was not constructed in accordance with applicable building codes;

    vi. The Home was not built according to the architectural drawings; and

    vii. Despite the implied warranties and representations made by agents, representatives and independent contractors, none of the repairs were properly and competently completed, and instead failed entirely to repair and remediate the damage to the Home. Such "repairs" only served to lull MILO into believing the home had been fixed.

194. Such damages include the cost to repair, remediate, and restore the Home to the condition it should have been delivered in.

195. In addition, such damages include the diminution of value to the Home.

**WHEREFORE**, MILO demands judgment in their favor and against Defendants 200 Christian Street Partners, Virgil Procaccino and Arthur Elwood jointly and severally, and requests that the Court enter an order:

    a. Awarding MILO actual damages and punitive damages, including compensatory, punitive and/or consequential damages, in an amount to be determined at trial;

    b. awarding MILO pre- and post-judgment interest in an amount to be determined at trial; and

    c. awarding MILO such other and further relief as the Court may deem equitable,

26

just and proper, including the award of costs, expenses, reasonable attorneys'
fees, reasonable inspection fees, relocation costs, and damages for the diminution
of value of the Home incurred by MILO in this action.

## COUNT IV
## (NEGLIGENCE)
## PLAINTIFF v. DEFENDANTS

196.    Plaintiff hereby incorporates all other paragraphs contained in this pleading as
though fully set forth herein

197.    Defendants owed MILO a duty of care to ensure that the construction of the
Home was completed in such a way that conformed to applicable building codes and the
architectural drawings, and did not present a danger to the Ferreiras.

198.    Defendants breached that duty in the manner in which they constructed the Home.

199.    As a direct and proximate result of those breaches, MILO has been damaged.

**WHEREFORE**, MILO demands judgment in their favor and against Defendants 200
Christian Street Partners, Virgil Procaccino and Arthur Elwood jointly and severally, and
requests that the Court enter an order:

   a.  Awarding MILO actual damages and punitive damages, including compensatory,
       punitive and/or consequential damages, in an amount to be determined at trial;

   b.  awarding MILO pre- and post-judgment interest in an amount to be determined at
       trial; and

   c.  awarding MILO such other and further relief as the Court may deem equitable,
       just and proper, including the award of costs, expenses, reasonable attorneys'
       fees, reasonable inspection fees, relocation costs, and damages for the diminution
       of value of the Home incurred by MILO in this action.

## COUNT V
## (NEGLIGENT SUPERIVISION)
## PLAINTIFF v. DEFENDANTS

200.    Plaintiff hereby incorporates by reference all other paragraphs as if set forth fully at length herein.

201.    Defendants had a duty to exercise reasonable care in the selection, hiring, retention, and supervising of its employees and subcontractors.

202.    Defendants and its owners and officers breached their duty to exercise reasonable care in the hiring and supervision of its employees when it failed to properly train and supervise competent employees, agents, representatives, sub-contractors and independent contractors in the construction of Home.

203.    Such failures led to the construction of the Home with significant and substantial defects, use of faulty materials, and failure to construct the Home to industry standard and according to the applicable building codes.

204.    As a direct and proximate result of Defendants' negligent conduct, MILO sustained the damages described herein.

**WHEREFORE**, MILO demands judgment in their favor and against Defendants 200 Christian Street Partners, Virgil Procaccino and Arthur Elwood jointly and severally, and requests that the Court enter an order:

    a.  Awarding MILO actual damages and punitive damages, including compensatory, punitive and/or consequential damages, in an amount to be determined at trial;

    b.  awarding MILO pre- and post-judgment interest in an amount to be determined at trial; and

    c.  awarding MILO such other and further relief as the Court may deem equitable, just and proper, including the award of costs, expenses, reasonable attorneys' fees, reasonable inspection fees, relocation costs, and damages for the diminution of value of the Home incurred by MILO in this action.

## COUNT VI
### (CIVIL CONSPIRACY)
### PLAINTIFF v. DEFENDANTS

205. MILO hereby incorporates by reference all other paragraphs as though set forth fully at length herein.

206. Defendants, amongst themselves, conspired and agreed to fraudulently represent to MILO, as well as multiple other homeowners not party to this suit, that they would design and construct homes without major defects or faults, in accordance with industry standards, according to the applicable building codes and according to the architectural drawings.

207. The Defendants entered into this agreement in furtherance of this conspiracy, to avoid their obligations as set forth in the UTPCPL and to breach their obligations under both express and implied warranties, in an effort to maximize profits, avoid required costs and otherwise enrich themselves at the expense of damage to MILO and their Home and personal property.

208. The Defendants took multiple overt acts to accomplish these purposes, including, but not limited to the use improper construction practices, as well as a concerted campaign to misrepresent the extent of the defects to the homes and to misrepresent the nature of the futile "repairs" and "remediation" to the Home.

209. As a result of these unlawful acts, MILO has been damaged as set forth herein.

**WHEREFORE**, MILO demands judgment in their favor and against Defendants 200 Christian Street Partners, Virgil Procaccino and Arthur Elwood jointly and severally, and requests that the Court enter an order:

   a. Awarding MILO actual damages and punitive damages, including compensatory, punitive and/or consequential damages, in an amount to be determined at trial;

   b. awarding MILO pre- and post-judgment interest in an amount to be determined at trial; and

29

      c.   awarding MILO such other and further relief as the Court may deem equitable, just and proper, including the award of costs, expenses, reasonable attorneys' fees, reasonable inspection fees, relocation costs, and damages for the diminution of value of the Home incurred by MILO in this action.

**COUNT VII**
**(VIOLATION OF PENNSYLVANIA REAL ESTATE SELLER DISCLOSURE LAW)**
**PLAINTIFF v. DEFENDANTS**

210.    MILO hereby incorporates by reference all other paragraphs as though set forth fully at length herein.

211.    The Real Estate Seller Disclosure Law requires that "[a]ny seller who intends to transfer any interest in real property shall disclose to the buyer any material defects with the property known to the seller . . . ." 68 Pa. C.S.A. § 7303.

212.    Any person "who willfully or negligently violates or fails to perform any duty prescribed by any provision of this chapter shall be liable in the amount of actual damages suffered by the buyer as a result of a violation of this chapter." 68 Pa. C.S.A. § 7311.

213.    As set forth more fully above, the Home was rife with defects that have had, and will continue to have, a significant adverse impact on the value of the property and that involve an unreasonable risk to people on the property.

214.    Further, as set forth more fully above, Defendants failed to disclose such material defects.

215.    Accordingly, Defendants have violated the Real Estate Seller Disclosure Law.

216.    As a result of Defendants' violation of the Real Estate Seller Disclosure Law, Plaintiff has suffered actual damages, including diminution of the value of the Home.

**WHEREFORE**, MILO demands judgment in their favor and against Defendants 200 Christian Street Partners, Virgil Procaccino and Arthur Elwood jointly and severally, and requests that the Court enter an order:

30

a. Awarding MILO actual damages and punitive damages, including compensatory, punitive and/or consequential damages, in an amount to be determined at trial;

b. awarding MILO pre- and post-judgment interest in an amount to be determined at trial; and

c. awarding MILO such other and further relief as the Court may deem equitable, just and proper, including the award of costs, expenses, reasonable attorneys' fees, reasonable inspection fees, relocation costs, and damages for the diminution of value of the Home incurred by MILO in this action.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by a jury of twelve (12) on all claims triable thereby.

Respectfully Submitted,

**BOCHETTO & LENTZ, P.C.**

Date:   January 30, 2017

By: _____
George Bochetto, Esquire
Bryan R. Lentz, Esquire
Peter R. Bryant, Esquire
1524 Locust Street
Philadelphia, PA, 19102
(215) 735-3900
(215) 735-2455
*Attorneys for Plaintiff*

31

# Exhibit "A"

Center City residential developers build on the 'wow' factor - philly-archives    Page 1 of 3

Case 2:16-cv-05759-RBS   Document 31-1   Filed 11/30/17   Page 59 of 114
Case 2:16-cv-05759-RBS   Document 31-1   Filed 10/30/18   Page 60 of 114

# philly●com

🏠 | News | Sports | Entertainment | Business | Opinion | Food | Lifestyle | Health | More

BREAKING   NEWS VIDEO   BLOGS   PHILADELPHIA   NEW JERSEY   POLITICS   EDUCATION   OPINION   OBITUARIES   NATION/WORLD   WEATHER   TRAFFIC   LOTTERY

Collections ∙ Homes

## Center City residential developers build on the 'wow' factor



Arthur "Art" Elwood Jr., cofounder of Christian Street Partners, at his latest project, at 12th and Lombard. (ANDREW THAYER / Staff Photographer)





**The END Of The Ellen Show!**

Leaked secret may bring down Ellen's empire! - Her fans OUTRAGED. See the secret she hid so well from the world...

**[FIRST LOOK]**

darieu.com



STANDS WITH

WATCH THE VIDEO

**By Erin Arvedlund, Inquirer Staff Writer**
POSTED: August 18, 2014

Arthur "Art" Elwood Jr., cofounder of Christian Street Partners with Virgil Procaccino, is an accountant-turned-real estate developer.

He and Procaccino have just completed their latest residential project, 501-507 S. 12th St. at Lombard in Center City, former site of the Pain Center, a medical office. After the property's owner was arrested for insurance fraud, Christian Street Partners bought the corner lot and developed it into six homes priced at $1.675 million to $2 million each.

"It took us a year to get this project going," Elwood said.

The old Pain Center sign is now "hanging in the bar down the block," he said, laughing. "It's very appropriate there."

The developers retained the Philadelphia-based firm Harman Deutsch as architect, and in place of the Brutalist-style two-story brick office structure now stand sleek single-family homes of 5,200 square feet, with two decks and two-car parking facing west on the side street.

A recent tour of one of the homes revealed a living room with large, wraparound picture windows and a gas fireplace, and a kitchen featuring modern Poggenpohl cabinetry with some sliding-door features.

Each house has an elevator and a trademark design that includes skylights, blond-wood floors, and wooden railings on the staircases.

The $10 million project was financed by Bryn Mawr Trust and is the latest in a string of Center City East developments in the booming neighborhood.

Christian Street Partners' first development was a 13-unit condominium project built in 2001 on the 200 block of Christian Street (hence the company's name). Others followed, at 741-59 S. Second St., 1537 Pine St., 22d Street between Locust and Spruce, and 21st Street between Lombard and Pine.

Procaccino was once an accounting client of Elwood's, and they became business partners. They have the same philosophy of working as general contractor and developer, buying the materials themselves and saving that money to put back into the business.

*We Recommend*

Ubiñas: When a bike lane is more than a bike lane
*August 27, 2014*

A booming $1 million-plus market for homes in Philly
*October 27, 2014*

*Find More Stories About*

Homes

Lombard

"Our subcontractors like that also, because they don't have to carry inventory and all they have to worry about is payroll," Elwood said.

Christian Street Partners is a family operation, too: Two of Elwood's three sons - oldest son Garrett and youngest son Hunter - have worked as accountant/bookkeeper and construction-management coordinator in recent years. John Duffy Jr., Procaccino's son-in-law, is their real estate agent. (John Krause of Century 21 Alliance also represents the 12th and Lombard property.)

For future projects, Elwood said, "we're looking in the Art Museum area and south of that area."

Christian Street Partners tries to differentiate itself.

"It's not a big field [of developers] in the $1 million-plus market," he said. "Our first four buyers looked at other developments and chose ours; maybe we are lucky because our neighborhoods are better. I do the closings, and all of our buyers said the designs were similar to other developers - two-car parking in the rear, for example. But we put the living space and kitchen on the second floor, with a rear deck as the outdoor space."

Almost all similar projects are more than 4,000 square feet and start in the $1 million-to-$1.5 million range, Elwood said. "But our buyers come in, and it's the 'wow' factor. For example, we add an extra six to eight inches in ceiling height. We don't skimp on that."

The million-dollar market for condominiums is alive and well in Philadelphia, as recent property transactions demonstrate. Interest rates are still low, and the city's tax abatement continues to bring in new residents from the suburbs.

A $1 million, 30-year mortgage can be had at 3.5 percent, Elwood said, with the remainder of the purchase price in cash.

"That is huge in driving the $1 million-plus market," he said. "It is a very hot market here."

In some cases, for jumbo mortgages (in the Philadelphia region, those greater than $417,000), "the banks are holding the mortgages themselves, which speeds approval," Elwood said. "And it takes as much work for the bank to do a $1 million mortgage as it does a $250,000 mortgage."

earvedlund@phillynews.com

215-854-2808 @erinarvedlund

**You May Like**                                                    Sponsored Links by Taboola

**Philadelphia: This Meal Service is Cheaper Than Your Local Store**
Home Chef

**These 70s Child Stars Are Unrecognizable Now**
Trend Chaser

**How To Fix Your Fatigue And Get More Energy**
Vital Reds Supplement

**Her Dress Dropped Jaws At The 2015 Met Gala**
StyleBistro

**7 Outrageous Credit Cards If You Have Excellent Credit**
NextAdvisor

**Pennsylvania Homeowners Born Before 1985 Are Getting a Huge Reward**
FetchaRate Quotes

**More From The Web**               **More From Philly.com**              Promoted Links

- **Philadelphia: This Meal Service is Cheaper Than Your Local Store** (Home Chef)
- **These 70s Child Stars Are Unrecognizable Now** (Trend Chaser)
- **How To Fix Your Fatigue And Get More Energy** (Vital Reds Supplement)
- **Her Dress Dropped Jaws At The 2015 Met Gala** (StyleBistro)
- **7 Outrageous Credit Cards If You Have Excellent Credit** (NextAdvisor)
- **New translation of Jewish mystical text for a new audience**
- **Toomey touts role in aiding child; stays mum on Trump**

- **Families dealing with suicide loss walk, comfort each other**
- **George Abouna, inventor of liver device**
- **After cow's treatment, a puzzling weakness**

by Taboola

comments powered by Disqus

**Commenting policy | Comments FAQ**

## HUD Homes From $10,000
Buy a HUD Home at huge 50% savings. Pay $1 to get listings in your area Go to hudforeclosed.com

## Flirty Plus Size Outfits - Exclusive Deals up to 70% Off
Shop trendy apparel for all sizes on zulily with sales up to 70% off! Go to zulily.com

### *FEATURED ARTICLES*



Wizard World 2014: The Bella Twins make a South Philly homecoming



Jeffrey H. Ware, 47, scientist at Penn



Parveen the 'It Girl' of local weather scene

*More:*

In Bulk Trucking, Chemical Leaman Is Rolling Toward The Top

Frank Nofer, 71, famed graphic artist

George Mattson, 88, Olympian, Crew Coach

De Mazia Art Brings $2.38 Million

Leader Of Jbm Sentenced To Life Aaron Jones Was Convicted Of Conspiring To Distribute $100 Million In Cocaine. He Plans To Appeal.

Jbm 8 Believed Founders

Index by Keyword | Index by Date | About Philly.com | Contact Us | Terms of Use & Privacy Statement | Copyright 2016

# Exhibit "B"

## STANDARD AGREEMENT FOR THE SALE OF REAL ESTATE    ASR

This form recommended and approved for, but not restricted to use by, the members of the Pennsylvania Association of Realtors® (PAR).

### PARTIES

BUYER(S): David Ferreira or assignee          SELLER(S): 200 Christian Street Partners

BUYER'S MAILING ADDRESS:                       SELLER'S MAILING ADDRESS:

### PROPERTY

ADDRESS (including postal city) 501 A S 12th Street

ZIP 19147

In the municipality of Philadelphia , County of Philadelphia

in the School District of Philadelphia , in the Commonwealth of Pennsylvania.

Tax ID #(s): tbd and/or

Identification (e.g., Parcel #; Lot, Block; Deed Book, Page, Recording Date):

### BUYER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ No Business Relationship (Buyer is not represented by a broker)

Broker (Company) Coldwell Banker Preferred          Licensee(s) (Name) Joe Herzog

Company Address 223 Market Street, Philadelphia, PA     Direct Phone(s) (267) 238-3508
19106                                                   Cell Phone(s) (215) 990-1956
Company Phone (215) 923-7600                            Fax (215) 558-1295
Company Fax                                             Email jherzog@cbpref.com

Broker is (check only one):                             Licensee(s) is (check only one):
☒ Buyer Agent (Broker represents Buyer only)            ☒ Buyer Agent
☐ Dual Agent (See Dual and/or Designated Agent box below)  ☐ Buyer Agent with Designated Agency
                                                        ☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Buyer)

### SELLER'S RELATIONSHIP WITH PA LICENSED BROKER

☐ No Business Relationship (Seller is not represented by a broker)

Broker (Company) Long and Foster - Lafayette Hill      Licensee(s) (Name) John Krause

Company Address 630 Germantown Pike                    Direct Phone(s) 215 460 0576
Lafayette Hill PA 19444                                 Cell Phone(s) 215 - 460 - 0576
Company Phone 120 - 828 - 2700                          Fax 215 - 253 - 3075
Company Fax                                             Email JohnTKrause@comcast.net

Broker is (check only one):                             Licensee(s) is (check only one):
☒ Seller Agent (Broker represents Seller only)          ☒ Seller Agent
☐ Dual Agent (See Dual and/or Designated Agent box below)  ☐ Seller Agent with Designated Agency
                                                        ☐ Dual Agent (See Dual and/or Designated Agent box below)

☐ Transaction Licensee (Broker and Licensee(s) provide real estate services but do not represent Seller)

### DUAL AND/OR DESIGNATED AGENCY

A Broker is a Dual Agent when a Broker represents both Buyer and Seller in the same transaction. A Licensee is a Dual Agent when a Licensee represents Buyer and Seller in the same transaction. All of Broker's Licensees are also Dual Agents UNLESS there are separate Designated Agents for Buyer and Seller. If the same Licensee is designated for Buyer and Seller, the Licensee is a Dual Agent.

By signing this Agreement, Buyer and Seller each acknowledge having been previously informed of, and consented to, dual agency, if applicable.

Buyer Initials: DCF /          ASR Page 1 of 13          Seller Initials: /

Pennsylvania Association of Realtors®          COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 2014
4/14

Coldwell Banker Preferred - Old City, 223-25 Market St Philadelphia, PA 19106          Phone: (267)238-3508          Fax (215)558-1295          Ferreira
Joe Herzog          Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026          www.zipLogix.com

1  **1.**  **By this Agreement**, dated November 11, 2014

2      Seller hereby agrees to sell and convey to Buyer, who agrees to purchase, the identified Property.

3  **2.**  **PURCHASE PRICE AND DEPOSITS (4-14)**

4      (A) Purchase Price $ **$1,955,000.00**

5      ( **One Million, Nine Hundred Fifty-Five Thousand**

6                                                     U.S. Dollars), to be paid by Buyer as follows:

7       1.  Initial Deposit, within   **2**   days of Execution Date, if not included

8          with this Agreement:                                $               **10,000.00**

9       2.  Additional Deposit within   **15**   days of the Execution Date:    $              **40,000.00**

10       3.                                                      $

11       Remaining balance will be paid at settlement.

12      (B) All funds paid by Buyer, including deposits, will be paid by check, cashier's check or wired funds. All funds paid by Buyer

13      within 30 days of settlement, including funds paid at settlement, will be by cashier's check or wired funds, but not by per-

14      sonal check.

15      (C) Deposits, regardless of the form of payment, will be paid in U.S. Dollars to Broker for Seller (unless otherwise stated here:

16                                                                                              )

17      who will retain deposits in an escrow account in conformity with all applicable laws and regulations until consummation or ter-

18      mination of this Agreement. Only real estate brokers are required to hold deposits in accordance with the rules and regulations of

19      the State Real Estate Commission. Checks tendered as deposit monies may be held uncashed pending the execution of this

20      Agreement.

21  **3.**  **SELLER ASSIST (If Applicable) (1-10)**

22      Seller will pay $                    or      **0.000**     % of Purchase Price (0 if not specified) toward

23      Buyer's costs, as permitted by the mortgage lender, if any. Seller is only obligated to pay up to the amount or percentage which is

24      approved by mortgage lender.

25  **4.**  **SETTLEMENT AND POSSESSION (4-14)**

26      (A) Settlement Date is **December 15, 2014**                   , or before if Buyer and Seller agree.

27      (B) Settlement will occur in the county where the Property is located or in an adjacent county, during normal business hours, unless

28      Buyer and Seller agree otherwise.

29      (C) At time of settlement, the following will be pro-rated on a daily basis between Buyer and Seller, reimbursing where applicable:

30      current taxes; rents; interest on mortgage assumptions; condominium fees and homeowner association fees; water and/or sewer

31      fees, together with any other lienable municipal service fees. All charges will be prorated for the period(s) covered. Seller will pay

32      up to and including the date of settlement and Buyer will pay for all days following settlement, unless otherwise stated here:

33                                                                                                      

34      (D) For purposes of prorating real estate taxes, the "periods covered" are as follows:

35      1.  Municipal tax bills for all counties and municipalities in Pennsylvania are for the period from January 1 to December 31.

36      2.  School tax bills for the Philadelphia, Pittsburgh and Scranton School Districts are for the period from January 1 to December 31.

37      School tax bills for all other school districts are for the period from July 1 to June 30.

38      (E) Conveyance from Seller will be by fee simple deed of special warranty unless otherwise stated here:                    

39                                    

40      (F) Payment of transfer taxes will be divided equally between Buyer and Seller unless otherwise stated here:

41                                      

42      (G) Possession is to be delivered by deed, existing keys and physical possession to a vacant Property free of debris, with all structures

43      broom-clean, at day and time of settlement, unless Seller, before signing this Agreement, has identified in writing that the Property

44      is subject to a lease.

45      (H) If Seller has identified in writing that the Property is subject to a lease, possession is to be delivered by deed, existing keys and

46      assignment of existing leases for the Property, together with security deposits and interest, if any, at day and time of settlement. Seller

47      will not enter into any new leases, nor extend existing leases, for the Property without the written consent of Buyer. Buyer will

48      acknowledge existing lease(s) by initialing the lease(s) at the execution of this Agreement, unless otherwise stated in this Agreement.

49      ☐ Tenant-Occupied Property Addendum (PAR Form TOP) is attached and made part of this Agreement.

50  **5.**  **DATES/TIME IS OF THE ESSENCE (1-10)**

51      (A) Written acceptance of all parties will be on or before: **November 14, 2014**

52      (B) The Settlement Date and all other dates and times identified for the performance of any obligations of this Agreement are of the

53      essence and are binding.

54      (C) The Execution Date of this Agreement is the date when Buyer and Seller have indicated full acceptance of this Agreement by sign-

55      ing and/or initialing it. For purposes of this Agreement, the number of days will be counted from the Execution Date, excluding

56      the day this Agreement was executed and including the last day of the time period. All changes to this Agreement should be ini-

57      tialed and dated.

58      (D) The Settlement Date is not extended by any other provision of this Agreement and may only be extended by mutual written agree-

59      ment of the parties.

60      (E) Certain terms and time periods are pre-printed in this Agreement as a convenience to the Buyer and Seller. All pre-printed terms

61      and time periods are negotiable and may be changed by striking out the pre-printed text and inserting different terms acceptable

62      to all parties, except where restricted by law.

63  Buyer Initials: _____ / _____                     ASR Page 2 of 13                      Seller Initials: _____ / _____

64   **6.**   **ZONING (4-14)**
65     Failure of this Agreement to contain the zoning classification (except in cases where the property (and each parcel thereof, if subdi-
66     vidable) is zoned solely or primarily to permit single-family dwellings) will render this Agreement voidable at Buyer's option, and, if
67     voided, any deposits tendered by the Buyer will be returned to the Buyer without any requirement for court action.
68     Zoning Classification, as set forth in the local zoning ordinance: _____

69   **7.**   **FIXTURES AND PERSONAL PROPERTY (4-14)**
70     (A)  INCLUDED in this sale, unless otherwise stated, are all existing items permanently installed in the Property, free of liens, and
71         other items including plumbing; heating; radiator covers; lighting fixtures (including chandeliers and ceiling fans); pools, spas
72         and hot tubs (including covers and cleaning equipment); electric animal fencing systems (excluding collars); garage door open-
73         ers and transmitters; television antennas; mounting brackets and hardware for television and sound equipment; unpotted shrub-
74         bery, plantings and trees; smoke detectors and carbon monoxide detectors; sump pumps; storage sheds; fences; mailboxes; wall
75         to wall carpeting; existing window screens, storm windows and screen/storm doors; window covering hardware (including rods
76         and brackets), shades and blinds; awnings; built-in air conditioners; built-in appliances; the range/oven; any remaining heating
77         and cooking fuels stored on the Property at the time of settlement; and, if owned, water treatment systems, propane tanks, satel-
78         lite dishes and security systems. Also included: _____
79         _____
80     (B)  The following items are LEASED (not owned by Seller). Contact the provider/vendor for more information (e.g., water treatment
81         systems, propane tanks, satellite dishes and security systems): _____
82     (C)  EXCLUDED fixtures and items: _____
83     _____

84   **8.**   **MORTGAGE CONTINGENCY (4-14)**
85     ☒  WAIVED. This sale is NOT contingent on mortgage financing, although Buyer may obtain mortgage financing and/or the par-
86         ties may include an appraisal contingency.
87     ☐  ELECTED.
88     (A)  This sale is contingent upon Buyer obtaining mortgage financing according to the following terms:

| 89 First Mortgage on the Property | Second Mortgage on the Property |
|---|---|
| 90 Loan Amount $ _____ | Loan Amount $ _____ |
| 91 Minimum Term _____ years | Minimum Term _____ years |
| 92 Type of mortgage | Type of mortgage |
| 93 For conventional loans, the Loan-To-Value (LTV) ratio is not to | For conventional loans, the Loan-To-Value (LTV) ratio is not to |
| 94 exceed _____ % | exceed _____ % |
| 95 Mortgage lender _____ | Mortgage lender _____ |
| 96 | |
| 97 Interest rate _____ %; however, Buyer agrees to accept the | Interest rate _____ %; however, Buyer agrees to accept the |
| 98 interest rate as may be committed by the mortgage lender, not | interest rate as may be committed by the mortgage lender, not |
| 99 to exceed a maximum interest rate of _____ %. | to exceed a maximum interest rate of _____ %. |
| 100 Discount points, loan origination, loan placement and other fees | Discount points, loan origination, loan placement and other fees |
| 101 charged by the lender as a percentage of the mortgage loan (exclud- | charged by the lender as a percentage of the mortgage loan (exclud- |
| 102 ing any mortgage insurance premiums or VA funding fee) not to | ing any mortgage insurance premiums or VA funding fee) not to |
| 103 exceed _____ % (0% if not specified) of the mortgage loan. | exceed _____ % (0% if not specified) of the mortgage loan. |

104     (B)  Mortgage Commitment Date _____
105         Upon receiving a mortgage commitment(s), Buyer will promptly deliver a copy of the commitment(s) to Seller.
106     (C)  The Loan-To-Value ratio (LTV) is used by lenders as one tool to help assess their potential risk of a mortgage loan. A particular
107         LTV may be necessary to qualify for certain loans, or buyers might be required to pay additional fees if the LTV exceeds a spe-
108         cific level. The appraised value of the Property is used by lenders to determine the maximum amount of a mortgage loan. The
109         appraised value is determined by an independent appraiser, subject to the mortgage lender's underwriter review, and may be high-
110         er or lower than the Purchase Price and/or market price of the property.
111     (D)  The interest rate(s) and fee(s) provisions in Paragraph 8(A) are satisfied if the mortgage lender(s) gives Buyer the right to guar-
112         antee the interest rate(s) and fee(s) at or below the maximum levels stated. If lender(s) gives Buyer the right to lock in the inter-
113         est rate(s), Buyer will do so at least   15   days before Settlement Date. Buyer gives Seller the right, at Seller's sole option and
114         as permitted by law and the mortgage lender(s), to contribute financially, without promise of reimbursement, to the Buyer and/or
115         the mortgage lender(s) to make the above mortgage term(s) available to Buyer.
116     (E)  Within _____ days (7 if not specified) from the Execution Date of this Agreement, Buyer will make a completed, written mort-
117         gage application (including payment for and ordering of appraisal and credit reports without delay, at the time required by
118         lender(s)) for the mortgage terms and to the mortgage lender(s) identified in Paragraph 8(A), if any, otherwise to a responsible
119         mortgage lender(s) of Buyer's choice. Broker for Buyer, if any, otherwise Broker for Seller, is authorized to communicate with
120         the mortgage lender(s) to assist in the mortgage loan process.
121     (F)  Buyer will be in default of this Agreement if Buyer furnishes false information to anyone concerning Buyer's financial and/or
122         employment status, fails to cooperate in good faith with processing the mortgage loan application (including delay of the apprais-
123         al), fails to lock in interest rate(s) as stated in Paragraph 8(D), or otherwise causes the lender to reject, or refuse to approve or
124         issue, a mortgage loan commitment.

125 Buyer Initials: _____ / _____         ASR Page 9 of 13          Seller Initials: _____ / _____

126 (G) 1. If Seller does not receive a copy of the mortgage commitment(s) by the Mortgage Commitment Date, Seller may terminate
127      this Agreement by written notice to Buyer. Seller's right to terminate continues until Buyer delivers a mortgage commitment
128      to Seller.
129   2. Seller may terminate this Agreement by written notice to Buyer after the Mortgage Commitment Date if the mortgage commitment:
130      a. Does not satisfy the terms of Paragraph 8(A), OR
131      b. Contains any condition not specified in this Agreement (e.g., Buyer must settle on another property, an appraisal must be
132        received by the lender, or the mortgage commitment is not valid through the Settlement Date) that is not satisfied and/or
133        removed in writing by the mortgage lender(s) within ___ 7 ___ DAYS after the Mortgage Commitment Date in Paragraph 8(B),
134        or any extension thereof, other than those conditions that are customarily satisfied at or near settlement (e.g., obtaining
135        insurance, confirming employment).
136   3. If this Agreement is terminated pursuant to Paragraphs 8(G)(1) or (2), or the mortgage loan(s) is not obtained for settlement,
137      all deposit monies will be returned to Buyer according to the terms of Paragraph 26 and this Agreement will be VOID. Buyer
138      will be responsible for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of
139      this Agreement, and any costs incurred by Buyer for: (1) Title search, title insurance and/or mechanics' lien insurance, or any
140      fee for cancellation; (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancel-
141      lation; (3) Appraisal fees and charges paid in advance to mortgage lender(s).
142 (H) If the mortgage lender(s), or a property and casualty insurer providing insurance required by the mortgage lender(s), requires
143    repairs to the Property, Buyer will, upon receiving the requirements, deliver a copy of the requirements to Seller. Within     5
144    DAYS of receiving the copy of the requirements, Seller will notify Buyer whether Seller will make the required repairs at Seller's
145    expense.
146   1. If Seller makes the required repairs to the satisfaction of the mortgage lender and/or insurer, Buyer accepts the Property and
147.      agrees to the RELEASE in Paragraph 28 of this Agreement.
148   2. If Seller will not make the required repairs, or if Seller fails to respond within the stated time, Buyer will, within     5
149      DAYS, notify Seller of Buyer's choice to:
150      a. Make the repairs/improvements at Buyer's expense, with permission and access to the Property given by Seller, which
151        will not be unreasonably withheld, OR
152      b. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
153        Paragraph 26 of this Agreement.
154      If Buyer fails to respond within the time stated in Paragraph 8(H)(2) or fails to terminate this Agreement by written notice to
155      Seller within that time, Buyer will accept the Property, make the required repairs/improvements at Buyer's expense and agree
156      to the RELEASE in Paragraph 28 of this Agreement.

---

157 **FHA/VA, IF APPLICABLE**
158 (I) It is expressly agreed that notwithstanding any other provisions of this contract, Buyer will not be obligated to complete the pur-
159    chase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless Buyer
160    has been given, in accordance with HUD/FHA or VA requirements, a written statement by the Federal Housing Commissioner,
161    Veterans Administration, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than
162    $_____ (the Purchase Price as stated in this Agreement). Buyer will have the privilege and option of
163    proceeding with consummation of the contract without regard to the amount of the appraised valuation. The appraised valuation
164    is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does
165    not warrant the value nor the condition of the Property. Buyer should satisfy himself/herself that the price and condition of the
166    Property are acceptable.
167    Warning: Section 1010 of Title 18, U.S.C., Department of Housing and Urban Development and Federal Housing
168    Administration Transactions, provides, "Whoever for the purpose of . . . influencing in any way the action of such Department,
169    makes, passes, utters or publishes any statement, knowing the same to be false shall be fined under this title or imprisoned not
170    more than two years, or both."
171 (J) U.S. Department of Housing and Urban Development (HUD) NOTICE TO PURCHASERS: Buyer's Acknowledgement
172    ☐ Buyer has received the HUD Notice "For Your Protection: Get a Home Inspection." Buyer understands the importance of
173    getting an independent home inspection and has thought about this before signing this Agreement. Buyer understands that
174    FHA will not perform a home inspection nor guarantee the price or condition of the Property.
175 (K) Certification We the undersigned, Seller(s) and Buyer(s) party to this transaction each certify that the terms of this contract
176    for purchase are true to the best of our knowledge and belief, and that any other agreement entered into by any of these parties
177    in connection with this transaction is attached to this Agreement.

---

178 **9. CHANGE IN BUYER'S FINANCIAL STATUS (4-14)**
179    In the event of a change in Buyer's financial status affecting Buyer's ability to purchase, Buyer shall promptly notify Seller and
180    lender(s) to whom the Buyer submitted a mortgage application, if any, in writing. A change in financial status includes, but is not lim-
181    ited to, loss or a change in employment; failure or loss of sale of Buyer's home; Buyer's having incurred a new financial obligation;
182    entry of a judgment against Buyer. Buyer understands that applying for and/or incurring an additional financial obligation may
183    affect Buyer's ability to purchase.

184 **10. SELLER REPRESENTATIONS (4-14)**
185    (A) Status of Water
186      Seller represents that the Property is served by:
187      ☒ Public Water    ☐ Community Water    ☐ On-site Water    ☐ None  ☐

188 Buyer Initials: **DLF** /                 ASR Page 4 of 13               Seller Initials: **/**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com            Ferreira

189    **(B) Status of Sewer**
190     1. Seller represents that the Property is served by:
191       ☒ Public Sewer     ☐ Community Sewage Disposal System     ☐ Ten-Acre Permit Exemption (see Sewage Notice 2)
192       ☐ Individual On-lot Sewage Disposal System (see Sewage Notice 1)     ☐ Holding Tank (see Sewage Notice 3)
193       ☐ Individual On-lot Sewage Disposal System in Proximity to Well (see Sewage Notice 1; see Sewage Notice 4, if applicable)
194       ☐ None (see Sewage Notice 1)     ☐ None Available/Permit Limitations in Effect (see Sewage Notice 5)
195       ☐ _____
196     2. Notices Pursuant to the Pennsylvania Sewage Facilities Act
197       Notice 1: There is no currently existing community sewage system available for the subject property. Section 7 of the
198       Pennsylvania Sewage Facilities Act provides that no person shall install, construct, request bid proposals for construction,
199       alter, repair or occupy any building or structure for which an individual sewage system is to be installed, without first obtain-
200       ing a permit. Buyer is advised by this notice that, before signing this Agreement, Buyer should contact the local agency
201       charged with administering the Act to determine the procedure and requirements for obtaining a permit for an individual
202       sewage system. The local agency charged with administering the Act will be the municipality where the Property is located
203       or that municipality working cooperatively with others.
204       Notice 2: This Property is serviced by an individual sewage system installed under the ten-acre permit exemption provisions
205       of Section 7 of the Pennsylvania Sewage Facilities Act. (Section 7 provides that a permit may not be required before installing,
206       constructing, awarding a contract for construction; altering, repairing or connecting to an individual sewage system where a ten-acre
207       parcel or lot is subdivided from a parent tract after January 10, 1987). Buyer is advised that soils and site testing were not conduct-
208       ed and that, should the system malfunction, the owner of the Property or properties serviced by the system at the time of a mal-
209       function may be held liable for any contamination, pollution, public health hazard or nuisance which occurs as a result.
210       Notice 3: This Property is serviced by a holding tank (permanent or temporary) to which sewage is conveyed by a
211       water carrying system and which is designed and constructed to facilitate ultimate disposal of the sewage at another
212       site. Pursuant to the Pennsylvania Sewage Facilities Act, Seller must provide a history of the annual cost of maintaining the
213       tank from the date of its installation or December 14, 1995, whichever is later.
214       Notice 4: An individual sewage system has been installed at an isolation distance from a well that is less than the dis-
215       tance specified by regulation. The regulations at 25 Pa. Code §73.13 pertaining to minimum horizontal isolation distances
216       provide guidance. Subsection (b) of §73.13 states that the minimum horizontal isolation distance between an individual water
217       supply or water supply system suction line and treatment tanks shall be 50 feet. Subsection (c) of §73.13 states that the hori-
218       zontal isolation distance between the individual water supply or water supply system suction line and the perimeter of the
219       absorption area shall be 100 feet.
220       Notice 5: This lot is within an area in which permit limitations are in effect and is subject to those limitations. Sewage facili-
221       ties are not available for this lot and construction of a structure to be served by sewage facilities may not begin until the municipality
222       completes a major planning requirement pursuant to the Pennsylvania Sewage Facilities Act and regulations promulgated thereunder.
223    **(C) Historic Preservation**
224       Seller is not aware of historic preservation restrictions regarding the Property unless otherwise stated here: _____
225       _____
226    **(D) Land Use Restrictions**
227     1. ☐ Property, or a portion of it, is subject to land use restrictions and may be preferentially assessed for tax purposes under the
228       following Act(s) (see Notices Regarding Land Use Restrictions below):
229       ☐ Agricultural Area Security Law (Right-to-Farm Law; 3 P.S. § 901 et seq.)
230       ☐ Farmland and Forest Land Assessment Act (Clean and Green Program; Act 319 of 1974; 72 P.S. § 5490.1 et seq.)
231       ☐ Open Space Act (Act 442 of 1967; 32 P.S. § 5001 et seq.)
232       ☐ Conservation Reserve Program (16 U.S.C. § 3831 et seq.)
233       ☐ Other _____
234     2. Notices Regarding Land Use Restrictions
235       a. Pennsylvania Right-To-Farm Act: The property you are buying maybe located in an area where agricultural operations
236       take place. Pennsylvania protects agricultural resources for the production of food and agricultural products. The law lim-
237       its circumstances where normal agricultural operations may be subject to nuisance lawsuits or restrictive ordinances.
238       b. Clean and Green Program: Properties enrolled in the Clean and Green Program receive preferential property tax assess-
239       ment. Buyer and Seller have been advised of the need to contact the County Tax Assessment Office before the execution
240       of this Agreement to determine the property tax implications that will or may result from the sale of the Property, or that
241       may result in the future as a result of any change in use of the Property or the land from which it is being separated.
242       c. Open Space Act: This Act enables counties to enter into covenants with owners of land designated as farm, forest, water
243       supply, or open space land in an adopted municipal, county or regional plan for the purpose of preserving the land as
244       open space. A covenant between the owner and county is binding upon any Buyer of the Property during the period of
245       time that the covenant is in effect (5 or 10 years). Covenants automatically renew at the end of the covenant period unless
246       specific termination notice procedures are followed. Buyer has been advised of the need to determine the restrictions that
247       will apply from the sale of the Property to Buyer and the property tax implications that will or may result from a change
248       in use of the Property, or any portion of it. Buyer is further advised to determine the term of any covenant now in effect.

249 Buyer Initials: _____ / _____       ASR Page 5 of 13       Seller Initials: _____ / _____
                                                  Ferreira

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

250    d. Conservation Reserve (Enhancement) Program: Properties enrolled in the Conservation Reserve Program or CREP are
251    environmentally-sensitive areas, the owners of which receive compensation in exchange for an agreement to maintain the
252    land in its natural state. Contracts last from 10 to 15 years and carry penalties to Seller if terminated early by Buyer. Buyer
253    has been advised of the need to determine the restrictions on development of the Property and the term of any contract now
254    in effect. Seller is advised to determine the financial implications that will or may result from the sale of the Property.

255 (E) **Real Estate Seller Disclosure Law**
256    Generally, the Real Estate Seller Disclosure Law requires that before an agreement of sale is signed, the seller in a residential real
257    estate transfer must make certain disclosures regarding the property to potential buyers in a form defined by the law. A residen-
258    tial real estate transfer is defined as a sale, exchange, installment sales contract, lease with an option to buy, grant or other trans-
259    fer of an interest in real property where NOT LESS THAN ONE AND NOT MORE THAN FOUR RESIDENTIAL
260    DWELLING UNITS are involved. Disclosures for condominiums and cooperatives are limited to the seller's particular unit(s).
261    Disclosures regarding common areas or facilities are not required, as those elements are already addressed in the laws that gov-
262    ern the resale of condominium and cooperative interests.

263 (F) **Public and/or Private Assessments**
264    1. Seller represents that, as of the date Seller signed this Agreement, no public improvement, condominium or homeowner asso-
265    ciation assessments have been made against the Property which remain unpaid, and that no notice by any government or pub-
266    lic authority (excluding assessed value) has been served upon Seller or anyone on Seller's behalf, including notices relating
267    to violations of zoning, housing, building, safety or fire ordinances that remain uncorrected, and that Seller knows of no con-
268    dition that would constitute a violation of any such ordinances that remain uncorrected, unless otherwise specified here: _____
269    _____
270    2. Seller knows of no other potential notices (including violations) and/or assessments except as follows: _____
271    _____

272 (G) **Highway Occupancy Permit**
273    Access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.

274 **11. WAIVER OF CONTINGENCIES (9-05)**
275 If this Agreement is contingent on Buyer's right to inspect and/or repair the Property, or to verify insurability, environmental condi-
276 tions, boundaries, certifications, zoning classification or use, or any other information regarding the Property, Buyer's failure to exer-
277 cise any of Buyer's options within the times set forth in this Agreement is a WAIVER of that contingency and Buyer accepts
278 the Property and agrees to the RELEASE in Paragraph 28 of this Agreement.

279 **12. BUYER'S DUE DILIGENCE/INSPECTIONS (4-14)**
280 (A) **Rights and Responsibilities**
281    1. Seller will provide access to insurers' representatives and, as may be required by this Agreement or by mortgage lender(s), to
282    surveyors, municipal officials, appraisers and inspectors. All parties and their real estate licensee(s) may attend any inspections.
283    2. Buyer may make a pre-settlement walk-through inspection of the Property. Buyer's right to this inspection is not waived by
284    any other provision of this Agreement.
285    3. Seller will have heating and all utilities (including fuel(s)) on for all inspections/appraisals.
286    4. All inspectors, including home inspectors, are authorized by Buyer to provide a copy of any Inspection Report to Broker for Buyer.
287    5. Seller has the right, upon request, to receive a free copy of any Inspection Report from the party for whom it was prepared.
288 (B) Buyer waives or elects at Buyer's expense to have the following inspections, certifications, and investigations (referred to as
289    "Inspection" or "Inspections") performed by professional contractors, home inspectors, engineers, architects and other properly
290    licensed or otherwise qualified professionals. All inspections shall be performed in a professional manner, unless otherwise
291    agreed in writing. If the same inspector is inspecting more than one system, the inspector must comply with the Home Inspection
292    Law. (See Paragraph 12(D) for Notices Regarding Property and Environmental Inspections)
293 (C) For elected Inspection(s), Buyer will, within the Contingency Period stated in Paragraph 13 (A), complete Inspections, obtain any
294    Inspection Reports or results (referred to as "Report" or "Reports"), and accept the Property, terminate this Agreement, or submit a
295    written corrective proposal to Seller, according to the terms of Paragraph 13 (B).
296    **Home/Property Inspections and Environmental Hazards (mold, etc.)**
297 **Elected**    Buyer may conduct an inspection of the Property's structural components; roof; exterior windows and exterior    **Waived**
298 _____/_____    doors; exterior building material, fascia, gutters and downspouts; swimming pools, hot tubs and spas; appliances; _____/_____
299    electrical systems; interior and exterior plumbing; public sewer systems; heating and cooling systems; water pene-
300    tration; electromagnetic fields; wetlands and flood plain delineation; structure square footage; mold and other envi-
301    ronmental hazards (e.g., fungi, indoor air quality, asbestos, underground storage tanks, etc.); and any other items
302    Buyer may select. If Buyer elects to have a home inspection of the Property, as defined in the Home Inspection Law,
303    the home inspection must be performed by a full member in good standing of a national home inspection associa-
304    tion, or a person supervised by a full member of a national home inspection association, in accordance with the eth-
305    ical standards and code of conductor practice of that association, or by a properly licensed or registered engineer or
306    architect. (See Notices Regarding Property & Environmental Inspections)
307    **Wood Infestation**
308 **Elected**    Buyer may obtain a written "Wood-Destroying Insect Infestation Inspection Report" from an inspector certified as    **Waived**
309 _____/_____    a wood-destroying pests pesticide applicator and will deliver it and all supporting documents and drawings provid- _____/_____
310    ed by the inspector to Seller. The Report is to be made satisfactory to and in compliance with applicable laws, mort-
311    gage lender requirements, and/or Federal Insuring and Guaranteeing Agency requirements. The Inspection is to be

312 Buyer Initials: DF /_____      ASR Page 6 of 13      Seller Initials: VF /_____



| | | |
|---|---|---|
| 313 | | limited to all readily-visible and accessible areas of all structures on the Property, except fences. If the Inspection |
| 314 | | reveals active infestation(s), Buyer, at Buyer's expense, may obtain a Proposal from a wood-destroying pests pes- |
| 315 | | ticide applicator to treat the Property. If the Inspection reveals damage from active or previous infestation(s), Buyer |
| 316 | | may obtain a written Report from a professional contractor, home inspector or structural engineer that is limited to |
| 317 | | structural damage to the Property caused by wood-destroying organisms and a Proposal to repair the Property. |
| 318 | | **Deeds, Restrictions and Zoning** |

**319 Elected** ____/____  Buyer may investigate easements, deed and use restrictions (including any historic-preservation restrictions or ordi- **Waived** ____/____

**320** nances) that apply to the Property and review local zoning ordinance. Buyer may verify that the present use of the

**321** Property (such as in-law quarters, apartments, home office, day care) is permitted and may elect to make the

**322** Agreement contingent upon an anticipated use, Present use: _____

**323** **Water Service**

**324 Elected** ____/____  Buyer may obtain an Inspection of the quality and quantity of the water system from a properly licensed or other- **Waived** ____/____

**325** wise qualified water/well testing company. If and as required by the inspection company, Seller, at Seller's

**326** expense, will locate and provide access to the on-site (or individual) water system. Seller will restore the Property

**327** to its previous condition, at Seller's expense, prior to settlement.

**328** **Radon**

**329 Elected** ____/____  Buyer may obtain a radon test of the Property from a certified inspector. The U.S. Environmental Protection **Waived** ____/____

**330** Agency (EPA) advises corrective action if the average annual exposure to radon is equal to or higher than 0.02

**331** working levels or 4 picoCuries/liter (4pCi/L). Radon is a natural, radioactive gas that is produced in the ground by

**332** the normal decay of uranium and radium. Studies indicate that extended exposure to high levels of radon gas can

**333** increase the risk of lung cancer. Radon can find its way into any air-space and can permeate a structure. If a house

**334** has a radon problem, it usually can be cured by increased ventilation and/or by preventing radon entry. Any per-

**335** son who tests, mitigates or safeguards a building for radon in Pennsylvania must be certified by the Department of

**336** Environmental Protection. Information about radon and about certified testing or mitigation firms is available

**337** through Department of Environmental Protection, Bureau of Radiation Protection, 13th Floor, Rachel Carson State

**338** Office Building, P.O. Box 8469, Harrisburg, PA 17105-8469, (800) 23RADON or (717) 783-3594. www.epa.gov

**339** **On-lot Sewage (If Applicable)**

**340 Elected** ____/____  Buyer may obtain an Inspection of the individual on-lot sewage disposal system from a qualified, professional **Waived** ____/____

**341** inspector. If and as required by the inspection company, Seller, at Seller's expense, will locate, provide access to,

**342** and empty the individual on-lot sewage disposal system. Seller will restore the Property to its previous condition,

**343** at Seller's expense, prior to settlement. See paragraph 13(C) for more information regarding the Individual On-lot

**344** Sewage Inspection Contingency.

**345** **Property and Flood Insurance**

**346 Elected** ____/____  Buyer may determine the insurability of the Property by making application for property and casualty insurance for **Waived** ____/____

**347** the Property to a responsible insurer. Broker for Buyer, if any, otherwise Broker for Seller, may communicate with

**348** the insurer to assist in the insurance process. If the Property is located in a flood plain, Buyer may be required to

**349** carry flood insurance at Buyer's expense, which may need to be ordered 14 days or more prior to Settlement Date.

**350** Revised flood maps and changes to Federal law may substantially increase future flood insurance premiums or

**351** require insurance for formerly exempted properties. Buyer should consult with one or more flood insurance agents

**352** regarding the need for flood insurance and possible premium increases.

**353** **Property Boundaries**

**354 Elected** ____/____  Buyer may engage the services of a surveyor, title abstractor, or other qualified professional to assess the legal **Waived** ____/____

**355** description, certainty and location of, boundaries and/or quantum of land. Most sellers have not had the Property

**356** surveyed as it is not a requirement of property transfer in Pennsylvania. Any fences, hedges, walls and other natural

**357** or constructed barriers may or may not represent the true boundary lines of the Property. Any numerical represen-

**358** tations of size of property are approximations only and may be inaccurate.

**359** **Lead-Based Paint Hazards (For Properties built prior to 1978 only)**

**360 Elected** ____/____  Before Buyer is obligated to purchase a residential dwelling built prior to 1978, Buyer has the option to conduct a **Waived** ____/____

**361** risk assessment and/or inspection of the Property for the presence of lead-based paint and/or lead-based paint haz-

**362** ards. Regardless of whether this inspection is elected or waived, the Residential Lead-Based Paint Hazard

**363** Reduction Act requires a seller of property built prior to 1978 to provide the Buyer with an EPA-approved

**364** lead hazards information pamphlet titled "Protect Your Family from Lead in Your Home," along with a sep-

**365** arate form, attached to this Agreement, disclosing Seller's knowledge of lead-based paint hazards and any

**366** lead-based paint records regarding the Property.

**367** **Other**

**368 Elected** _____  _____ **Waived** ____/____

**369** ____/____

**370**

**371** The Inspections elected above do not apply to the following existing conditions and/or items: _____

**372** _____

**373**

**374** **(D) Notices Regarding Property & Environmental Inspections**

**375**     1. **Exterior Building Materials:** Poor or improper installation of exterior building materials may result in moisture penetrating

**376**     the surface of a structure where it may cause mold and damage to the building's frame.

**377** Buyer Initials: ____/____         **ASR Page 7 of 13**        Seller Initials: ____/____



378    2. Asbestos: Asbestos is linked with several adverse health effects, including various forms of cancer.

379    3. Environmental Hazards: The U.S. Environmental Protection Agency has a list of hazardous substances, the use and dispos-
380    al of which are restricted by law. Generally, if hazardous substances are found on a property, it is the property owner's respon-
381    sibility to dispose of them properly.

382    4. Wetlands: Wetlands are protected by the federal and state governments. Buyer may wish to hire an environmental engineer
383    to investigate whether the Property is located in a wetlands area to determine if permits for plans to build, improve or develop
384    the property would be affected or denied because of its location in a wetlands area.

385    5. Mold, Fungi and Indoor Air Quality: Indoor mold contamination and the inhalation of bioaerosols (bacteria, mold spores,
386    pollen and viruses) have been associated with allergic responses.

387    6. Additional Information: Inquiries or requests for more information about asbestos and other hazardous substances can be
388    directed to the U.S. Environmental Protection Agency, Ariel Rios Building, 1200 Pennsylvania Ave., N.W., Washington, D.C.
389    20460, (202) 272-0167, and/or the Department of Health, Commonwealth of Pennsylvania, Division of Environmental Health,
390    Harrisburg, PA 17120. Information about indoor air quality issues is available through the Pennsylvania Department of Health
391    and may be obtained by contacting Health & Welfare Building, 8th Floor West, 625 Forster St., Harrisburg, PA 17120, or by
392    calling 1-877-724-3258.

393  **13. INSPECTION CONTINGENCY (4-14)**

394    (A) The Contingency Period is   **15**   days (10 if not specified) from the Execution Date of this Agreement for each Inspection elect-
395    ed in Paragraph 12(C).

396    (B) Except as stated in Paragraph 13(C), if the result of any Inspection elected in Paragraph 12(C) is unsatisfactory to Buyer, Buyer
397    will, within the stated Contingency Period:

398       1. Accept the Property with the information stated in the Report(s) and agree to the RELEASE in Paragraph 28 of this Agreement, OR

399       2. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
400          Paragraph 26 of this Agreement, OR

401       3. Present the Report(s) to Seller with a Written Corrective Proposal ("Proposal") listing corrections and/or credits desired by Buyer.
402          The Proposal may, but is not required to, include the name(s) of a properly licensed or qualified professional(s) to perform the cor-
403          rections requested in the Proposal, provisions for payment, including retests, and a projected date for completion of the correc-
404          tions. Buyer agrees that Seller will not be held liable for corrections that do not comply with mortgage lender or governmental
405          requirements if performed in a workmanlike manner according to the terms of Buyer's Proposal.

406         a. Following the end of the Contingency Period, Buyer and Seller will have       days (5 if not specified) for a Negotiation
407            Period.

408           (1) During the Negotiation Period, Seller will either agree to satisfy all the terms of Buyer's Proposal or negotiate, by writ-
409              ten or verbal communication, another mutually acceptable written agreement, providing for any repairs or improvements
410              to the Property and/or any credit to Buyer at settlement, as acceptable to the mortgage lender, if any.

411           (2) If Seller agrees to satisfy all the terms of Buyer's Proposal, or Buyer and Seller enter into another mutually acceptable
412              written agreement, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement and the
413              Negotiation Period ends.

414         b. If no mutually acceptable written agreement is reached, or if Seller fails to respond, during the Negotiation Period, with-
415           in       days (2 if not specified) following the end of the Negotiation Period, Buyer will:

416           (1) Accept the Property with the information stated in the Report(s) and agree to the RELEASE in Paragraph 28 of this
417              Agreement, OR

418           (2) Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms
419              of Paragraph 26 of this Agreement.

420         If Buyer and Seller do not reach a mutually acceptable written agreement, and Buyer does not terminate this
421         Agreement by written notice to Seller within the time allotted in Paragraph 13(B)(3)(b), Buyer will accept the Property
422         and agree to the RELEASE in Paragraph 28 of this Agreement. Ongoing negotiations do not automatically extend the
423         Negotiation Period.

424    (C) If a Report reveals the need to expand or replace the existing individual on-lot sewage disposal system, Seller may, within     
425       days (25 if not specified) of receiving the Report, submit a Proposal to Buyer. The Proposal will include, but not be limited to, the
426       name of the company to perform the expansion or replacement; provisions for payment, including retests; and a projected com-
427       pletion date for corrective measures. Within   **5**   DAYS of receiving Seller's Proposal, or if no Proposal is provided within the
428       stated time, Buyer will notify Seller in writing of Buyer's choice to:

429       1. Agree to the terms of the Proposal, accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement, OR

430       2. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
431          Paragraph 26 of this Agreement, OR

432       3. Accept the Property and the existing system and agree to the RELEASE in Paragraph 28 of this Agreement. If required by any
433          mortgage lender and/or any governmental authority, Buyer will correct the defects before settlement or within the time required
434          by the mortgage lender and/or governmental authority, at Buyer's sole expense, with permission and access to the Property given
435          by Seller, which may not be unreasonably withheld. If Seller denies Buyer permission and/or access to correct the defects, Buyer
436          may, within   **5**   DAYS of Seller's denial, terminate this Agreement by written notice to Seller, with all deposit monies returned
437          to Buyer according to the terms of Paragraph 26 of this Agreement.

438      If Buyer fails to respond within the time stated in Paragraph 13(C) or fails to terminate this Agreement by written notice to
439    Seller within that time, Buyer will accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement.

440  Buyer Initials: **RF** /                ASR Page 8 of 13             Seller Initials: /     Ferrein

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

441 **14. REAL ESTATE TAXES AND ASSESSED VALUE (4-14)**
442 In Pennsylvania, taxing authorities (school districts and municipalities) and property owners may appeal the assessed value of a prop-
443 erty at the time of sale, or at any time thereafter. A successful appeal by a taxing authority may result in a higher assessed value for
444 the property and an increase in property taxes. Also, periodic county-wide property reassessments may change the assessed value of
445 the property and result in a change in property tax.

446 **15. NOTICES, ASSESSMENTS AND MUNICIPAL REQUIREMENTS (4-14)**
447 (A) In the event any notices of public and/or private assessments as described in Paragraph 10(F) (excluding assessed value) are
448 received after Seller has signed this Agreement and before settlement, Seller will within _____5_____ DAYS of receiving the notices
449 and/or assessments provide a copy of the notices and/or assessments to Buyer and will notify Buyer in writing that Seller will:
450 1. Fully comply with the notices and/or assessments, at Seller's expense, before settlement. If Seller fully complies with the
451 notices and/or assessments, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement, OR
452 2. Not comply with the notices and/or assessments. If Seller chooses not to comply with the notices and/or assessments, or fails
453 within the stated time to notify Buyer whether Seller will comply, Buyer will notify Seller in writing within _____5_____ DAYS
454 that Buyer will:
455 a. Comply with the notices and/or assessments at Buyer's expense, accept the Property, and agree to the RELEASE in
456 Paragraph 28 of this Agreement, OR
457 b. Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of
458 Paragraph 26 of this Agreement.
459 If Buyer fails to respond within the time stated in Paragraph 15(A)(2) or fails to terminate this Agreement by written notice to
460 Seller within that time, Buyer will accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement.
461 (B) If required by law, within _____30_____ DAYS from the Execution Date of this Agreement, but in no case later than _____15_____ DAYS prior to
462 Settlement Date, Seller will order at Seller's expense a certification from the appropriate municipal department(s) disclosing notice
463 of any uncorrected violations of zoning, housing, building, safety or fire ordinances and/or a certificate permitting occupancy of the
464 Property. If Buyer receives a notice of any required repairs/improvements, Buyer will promptly deliver a copy of the notice to Seller.
465 1. Within _____5_____ DAYS of receiving notice from the municipality that repairs/improvements are required, Seller will deliver a
466 copy of the notice to Buyer and notify Buyer in writing that Seller will:
467 a. Make the required repairs/improvements to the satisfaction of the municipality. If Seller makes the required repairs/improve-
468 ments, Buyer accepts the Property and agrees to the RELEASE in Paragraph 28 of this Agreement, OR
469 b. Not make the required repairs/improvements. If Seller chooses not to make the required repairs/improvements, Buyer will
470 notify Seller in writing within _____5_____ DAYS that Buyer will:
471 (1) Make the repairs/improvements at Buyer's expense, with permission and access to the Property given by Seller, which
472 will not be unreasonably withheld, OR
473 (2) Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms
474 of Paragraph 26 of this Agreement.
475 If Buyer fails to respond within the time stated in Paragraph 15(B)(1)(b) or fails to terminate this Agreement by writ-
476 ten notice to Seller within that time, Buyer will accept the Property and agree to the RELEASE in Paragraph 28 of this
477 Agreement, and Buyer accepts the responsibility to perform the repairs/improvements according to the terms of the
478 notice provided by the municipality.
479 2. If Seller denies Buyer permission to make the required repairs/improvements, or does not provide Buyer access before
480 Settlement Date to make the required repairs/improvements, Buyer may, within _____5_____ DAYS, terminate this Agreement by
481 written notice to Seller, with all deposit monies returned to Buyer according to the terms of Paragraph 26 of this Agreement.
482 3. If repairs/improvements are required and Seller fails to provide a copy of the notice to Buyer as required in this Paragraph, Seller
483 will perform all repairs/improvements as required by the notice at Seller's expense. Paragraph 15(B)(3) will survive settlement.

484 **16. CONDOMINIUM/PLANNED COMMUNITY (HOMEOWNER ASSOCIATIONS) RESALE NOTICE (1-10)**
485 (A) Property is NOT a Condominium or part of a Planned Community unless checked below.
486 ☐ CONDOMINIUM. The Property is a unit of a condominium that is primarily run by a unit owners' association. Section 3407 of
487 the Uniform Condominium Act of Pennsylvania requires Seller to furnish Buyer with a Certificate of Resale and copies of the
488 condominium declaration (other than plats and plans), the bylaws and the rules and regulations of the association.
489 ☐ PLANNED COMMUNITY (HOMEOWNER ASSOCIATION). The Property is part of a planned community as defined by
490 the Uniform Planned Community Act. Section 5407(a) of the Act requires Seller to furnish Buyer with a copy of the declara-
491 tion (other than plats and plans), the bylaws, the rules and regulations of the association, and a Certificate containing the pro-
492 visions set forth in Section 5407(a) of the Act.
493 (B) THE FOLLOWING APPLIES TO PROPERTIES THAT ARE PART OF A CONDOMINIUM OR A PLANNED COMMUNITY:
494 1. Within _____15_____ DAYS from the Execution Date of this Agreement, Seller, at Seller's expense, will request from the associa-
495 tion a Certificate of Resale and any other documents necessary to enable Seller to comply with the relevant Act. The Act pro-
496 vides that the association is required to provide these documents within 10 days of Seller's request.
497 2. Seller will promptly deliver to Buyer all documents received from the association. Under the Act, Seller is not liable to Buyer
498 for the failure of the association to provide the Certificate in a timely manner or for any incorrect information provided by the
499 association in the Certificate.
500 3. The Act provides that Buyer may declare this Agreement VOID at any time before Buyer receives the association documents and for
501 5 days after receipt, OR until settlement, whichever occurs first. Buyer's notice to Seller must be in writing; upon Buyer declaring
502 this Agreement void, all deposit monies will be returned to Buyer according to the terms of Paragraph 26 of this Agreement.

503 Buyer Initials: _____ / _____                     ASR Page 9 of 13                     Seller Initials: _____ / _____
                                                                                                                    Ferreira



504      4. If the association has the right to buy the Property (right of first refusal), and the association exercises that right, Seller will
505      reimburse Buyer for any costs incurred by Buyer for any inspections or certifications obtained according to the terms of the
506      Agreement, and any costs incurred by Buyer for: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee
507      for cancellation; (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation;
508      (3) Appraisal fees and charges paid in advance to mortgage lender.

509 **17. TITLES, SURVEYS AND COSTS (4-14)**
510    (A) The Property will be conveyed with good and marketable title that is insurable by a reputable title insurance company at the reg-
511      ular rates, free and clear of all liens, encumbrances, and easements, excepting however the following: existing deed restrictions;
512      historic preservation restrictions or ordinances; building restrictions; ordinances; easements of roads; easements visible upon the
513      ground; easements of record; and privileges or rights of public service companies, if any.
514    (B) Buyer will pay for the following: (1) Title search, title insurance and/or mechanics' lien insurance, or any fee for cancellation;
515      (2) Flood insurance, fire insurance, hazard insurance, mine subsidence insurance, or any fee for cancellation; (3) Appraisal fees
516      and charges paid in advance to mortgage lender; (4) Buyer's customary settlement costs and accruals.
517    (C) Seller has the right, upon request, to receive a free copy of any title abstract for the Property from the party for whom it was prepared.
518    (D) Any survey or surveys required by the title insurance company or the abstracting company for preparing an adequate legal
519      description of the Property (or the correction thereof) will be obtained and paid for by Seller. Any survey or surveys desired by
520      Buyer or required by the mortgage lender will be obtained and paid for by Buyer.
521    (E) In the event of a change in Seller's financial status affecting Seller's ability to convey title to the Property on or before the
522      Settlement Date, or any extension thereof, Seller shall promptly notify Buyer in writing. A change in financial status includes,
523      but is not limited to, Seller filing bankruptcy; filing of a foreclosure lawsuit against the Property; entry of a monetary judgment
524      against Seller; notice of public tax sale affecting the Property; and Seller learning that the sale price of the Property is no longer
525      sufficient to satisfy all liens and encumbrances against the Property.
526    (F) If Seller is unable to give good and marketable title that is insurable by a reputable title insurance company at the regular rates, as
527      specified in Paragraph 17(A), Buyer may terminate this Agreement by written notice to Seller, with all deposit monies returned to
528      Buyer according to the terms of Paragraph 26 of this Agreement. Upon termination, Seller will reimburse Buyer for any costs
529      incurred by Buyer for any inspections or certifications obtained according to the terms of this Agreement, and for those items spec-
530      ified in Paragraph 17(B) items (1), (2), (3) and in Paragraph 17(D).
531    (G) Oil, gas, mineral, or other rights of this Property may have been previously conveyed or leased, and Sellers make no representa-
532      tion about the status of those rights unless indicated elsewhere in this Agreement.
533      ☐ Oil, Gas and Mineral Rights Addendum (PAR Form OGM) is attached to and made part of this Agreement.
534    (H) **COAL NOTICE (Where Applicable)**
535      THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDERNEATH
536      THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL
537      RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE,
538      BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of the Act of
539      July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against subsidence resulting
540      from coal mining operations, and that the property described herein may be protected from damage due to mine subsidence by a
541      private contract with the owners of the economic interests in the coal. This acknowledgement is made for the purpose of com-
542      plying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act of April 27, 1966."
543      Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.
544    (I) The Property is not in a "coal land coal" as defined in the Pennsylvania Construction Code Act unless otherwise stated here:
545
546    (I) 1. This property is not subject to a Private Transfer Fee Obligation unless otherwise stated here:
547      ☐ Private Transfer Fee Addendum (PAR Form PTF) is attached to and made part of this Agreement.
548      2. Notices Regarding Private Transfer Fees; In Pennsylvania, Private Transfer Fees are defined and regulated in the Private Transfer
549      Fee Obligation Act (Act 1 of 2011; 68 Pa.C.S. §§ 8101, et. seq.), which defines a Private Transfer Fee as "a fee that is payable upon
550      the transfer of an interest in real property, or payable for the right to make or accept the transfer, if the obligation to pay the fee or charge
551      runs with title to the property or otherwise binds subsequent owners of property, regardless of whether the fee or charge is a fixed
552      amount or is determined as a percentage of the value of the property, the purchase price or other consideration given for the transfer."
553      A Private Transfer Fee must be properly recorded to be binding, and sellers must disclose the existence of the fees to prospective buy-
554      ers. Where a Private Transfer Fee is not properly recorded or disclosed, the Act gives certain rights and protections to buyers.

555 **18. MAINTENANCE AND RISK OF LOSS (1-14)**
556    (A) Seller will maintain the Property (including, but not limited to, structures, grounds, fixtures, appliances, and personal property)
557      specifically listed in this Agreement in its present condition, normal wear and tear excepted.
558    (B) If any part of the Property included in the sale fails before settlement, Seller will:
559      1. Repair or replace that part of the Property before settlement, OR
560      2. Provide prompt written notice to Buyer of Seller's decision to:
561        a. Credit Buyer at settlement for the fair market value of the failed part of the Property, as acceptable to the mortgage lender,
562        if any, OR
563        b. Not repair or replace the failed part of the Property, and not credit Buyer at settlement for the fair market value of the
564        failed part of the Property.
565      3. If Seller does not repair or replace the failed part of the Property or agree to credit Buyer for its fair market value, or if Seller
566      fails to notify Buyer of Seller's choice, Buyer will notify Seller in writing within _____5_____ DAYS or before Settlement Date,
567      whichever is earlier, that Buyer will:

558 Buyer Initials: _____/_____      ASR Page 10 of 13      Seller Initials: _____/_____
                                                      Ferreira

569      a.   Accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement, OR

570      b.   Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of

571        Paragraph 26 of this Agreement.

572        If Buyer fails to respond within the time stated in Paragraph 18(B)(3) or fails to terminate this Agreement by written notice

573        to Seller within that time, Buyer will accept the Property and agree to the RELEASE in Paragraph 28 of this Agreement.

574   (C)   Seller bears the risk of loss from fire or other casualties until settlement. If any property included in this sale is destroyed and not

575        replaced prior to settlement, Buyer will:

576      1.   Accept the Property in its then current condition together with the proceeds of any insurance recovery obtainable by Seller, OR

577      2.   Terminate this Agreement by written notice to Seller, with all deposit monies returned to Buyer according to the terms of

578        Paragraph 26 of this Agreement.

579 **19. HOME WARRANTIES (1-10)**

580     At or before settlement, either party may purchase a home warranty for the Property from a third-party vendor. Buyer and Seller under-

581 stand that a home warranty for the Property does not alter any disclosure requirements of Seller, will not cover or warrant any pre-

582 existing defects of the Property, and will not alter, waive or extend any provisions of this Agreement regarding inspections or certifi-

583 cations that Buyer has elected or waived as part of this Agreement. Buyer and Seller understand that a broker who recommends a home

584 warranty may have a business relationship with the home warranty company that provides a financial benefit to the broker.

585 **20. RECORDING (9-05)**

586     This Agreement will not be recorded in the Office of the Recorder of Deeds or in any other office or place of public record. If Buyer

587 causes or permits this Agreement to be recorded, Seller may elect to treat such act as a default of this Agreement.

588 **21. ASSIGNMENT (1-10)**

589     This Agreement is binding upon the parties, their heirs, personal representatives, guardians and successors, and to the extent assigna-

590 ble, on the assigns of the parties hereto. Buyer will not transfer or assign this Agreement without the written consent of Seller unless

591 otherwise stated in this Agreement. Assignment of this Agreement may result in additional transfer taxes.

592 **22. GOVERNING LAW, VENUE AND PERSONAL JURISDICTION (9-05)**

593   (A)   The validity and construction of this Agreement, and the rights and duties of the parties, will be governed in accordance with the

594        laws of the Commonwealth of Pennsylvania.

595   (B)   The parties agree that any dispute, controversy or claim arising under or in connection with this Agreement or its performance by either

596        party submitted to a court shall be filed exclusively by and in the state or federal courts sitting in the Commonwealth of Pennsylvania.

597 **23. FOREIGN INVESTMENT IN REAL PROPERTY TAX ACT OF 1980 (FIRPTA) (4-14)**

598     The disposition of a U.S. real property interest by a foreign person (the transferor) is subject to the Foreign Investment in Real Property

599 Tax Act of 1980 (FIRPTA) income tax withholding. FIRPTA authorized the United States to tax foreign persons on dispositions of

600 600 U.S. real property interests. This includes but is not limited to a sale or exchange, liquidation, redemption, gift, transfers, etc. Persons

601 purchasing U.S. real property interests (transferee) from foreign persons, certain purchasers' agents, and settlement officers are

602 required to withhold 10 percent of the amount realized (special rules for foreign corporations). Withholding is intended to ensure U.S.

603 taxation of gains realized on disposition of such interests. The transferee/Buyer is the withholding agent. If you are the

604 transferee/Buyer you must find out if the transferor is a foreign person as defined by the Act. If the transferor is a foreign person and

605 you fail to withhold, you may be held liable for the tax.

606 **24. NOTICE REGARDING CONVICTED SEX OFFENDERS (MEGAN'S LAW) (4-14)**

607     The Pennsylvania General Assembly has passed legislation (often referred to as "Megan's Law," 42 Pa.C.S. § 9791 et seq.) providing

608 for community notification of the presence of certain convicted sex offenders. Buyers are encouraged to contact the municipal

609 police department or the Pennsylvania State Police for information relating to the presence of sex offenders near a particular prop-

610 erty, or to check the information on the Pennsylvania State Police Web site at WWW.pameganslaw.state.pa.us.

611 **25. REPRESENTATIONS (1-10)**

612   (A)   All representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their

613        licensees, employees, officers or partners are not a part of this Agreement unless expressly incorporated or stated in this

614        Agreement. This Agreement contains the whole agreement between Seller and Buyer, and there are no other terms, obligations,

615        covenants, representations, statements or conditions, oral or otherwise, of any kind whatsoever concerning this sale. This

616        Agreement will not be altered, amended, changed or modified except in writing executed by the parties.

617   (B)   Unless otherwise stated in this Agreement, Buyer has inspected the Property (including fixtures and any personal property

618        specifically listed herein) before signing this Agreement or has waived the right to do so, and agrees to purchase the

619        Property **IN ITS PRESENT CONDITION**, subject to inspection contingencies elected in this Agreement. Buyer acknowledges

620        that Brokers, their licensees, employees, officers or partners have not made an independent examination or determination of the

621        structural soundness of the Property, the age or condition of the components, environmental conditions, the permitted uses, nor

622        of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection of any of the sys-

623        tems contained therein.

624   (C)   Any repairs required by this Agreement will be completed in a workmanlike manner.

625   (D)   Broker(s) have provided or may provide services to assist unrepresented parties in complying with this Agreement.

626 **26. DEFAULT, TERMINATION AND RETURN OF DEPOSITS (4-14)**

627   (A)   Where Buyer terminates this Agreement pursuant to any right granted by this Agreement, Buyer will be entitled to a return of all

628        deposit monies paid on account of Purchase Price pursuant to the terms of Paragraph 26(B), and this Agreement will be VOID.

629        Termination of this Agreement may occur for other reasons giving rise to claims by Buyer and/or Seller for the deposit monies.

630   (B)   Regardless of the apparent entitlement to deposit monies, Pennsylvania law does not allow a Broker holding deposit monies to

631        determine who is entitled to the deposit monies when settlement does not occur. Broker can only release the deposit monies:

632      1.   If this Agreement is terminated prior to settlement and there is no dispute over entitlement to the deposit monies, a written

633        agreement signed by both parties is evidence that there is no dispute regarding deposit monies.

634 Buyer Initials: _XF_ / _____          ASR Page 11 of 13          Seller Initials: _VF_ / _____

635        2. If, after Broker has received deposit monies, Broker receives a written agreement that is signed by Buyer and Seller,
636        directing Broker how to distribute some or all of the deposit monies.
637        3. According to the terms of a final order of court.
638        4. According to the terms of a prior written agreement between Buyer and Seller that directs the Broker how to distribute
639        the deposit monies if there is a dispute between the parties that is not resolved. (See Paragraph 26(C))
640    (C) Buyer and Seller agree that if there is a dispute over the entitlement to deposit monies that is unresolved     **90**    days (180 if
641        not specified) after the Settlement Date stated in Paragraph 4(A), or any written extensions thereof, the Broker holding the
642        deposit monies will, within 30 days of receipt of Buyer's written request, distribute the deposit monies to Buyer unless the
643        Broker is in receipt of verifiable written notice that the dispute is the subject of litigation or mediation. If Broker has received
644        verifiable written notice of litigation prior to the receipt of Buyer's request for distribution, Broker will continue to hold the
645        deposit monies until receipt of a written distribution agreement between Buyer and Seller or a final court order. Buyer and Seller
646        are advised to initiate litigation for any portion of the deposit monies prior to any distribution made by Broker pursuant to this
647        paragraph. Buyer and Seller agree that the distribution of deposit monies based upon the passage of time does not legally deter-
648        mine entitlement to deposit monies, and that the parties maintain their legal rights to pursue litigation even after a distribution
649        is made.
650    (D) Buyer and Seller agree that a Broker who holds or distributes deposit monies pursuant to the terms of Paragraph 26 or
651        Pennsylvania law will not be liable. Buyer and Seller agree that if any Broker or affiliated licensee is named in litigation
652        regarding deposit monies, the attorneys' fees and costs of the Broker(s) and licensee(s) will be paid by the party naming
653        them in litigation.
654    (E) Seller has the option of retaining all sums paid by Buyer, including the deposit monies, should Buyer:
655        1. Fail to make any additional payments as specified in Paragraph 2, OR
656        2. Furnish false or incomplete information to Seller, Broker(s), or any other party identified in this Agreement concerning
657        Buyer's legal or financial status, OR
658        3. Violate or fail to fulfill and perform any other terms or conditions of this Agreement.
659    (F) Unless otherwise checked in Paragraph 26(G), Seller may elect to retain those sums paid by Buyer, including deposit monies:
660        1. On account of purchase price, OR
661        2. As monies to be applied to Seller's damages, OR
662        3. As liquidated damages for such default.
663    (G) ☒ SELLER IS LIMITED TO RETAINING SUMS PAID BY BUYER, INCLUDING DEPOSIT MONIES, AS LIQUIDATED
664        DAMAGES.
665    (H) If Seller retains all sums paid by Buyer, including deposit monies, as liquidated damages pursuant to Paragraph 26(F) or (G),
666        Buyer and Seller are released from further liability or obligation and this Agreement is VOID.
667    (I) Brokers and licensees are not responsible for unpaid deposits.
668  **27. MEDIATION (1-10)**
669    Buyer and Seller will submit all disputes or claims that arise from this Agreement, including disputes and claims over deposit monies,
670  to mediation. Mediation will be conducted in accordance with the Rules and Procedures of the Home Sellers/Home Buyers Dispute
671  Resolution System, unless it is not available, in which case Buyer and Seller will mediate according to the terms of the mediation sys-
672  tem offered or endorsed by the local Association of Realtors®. Mediation fees, contained in the mediator's fee schedule, will be
673  divided equally among the parties and will be paid before the mediation conference. This mediation process must be concluded before
674  any party to the dispute may initiate legal proceedings in any courtroom, with the exception of filing a summons if it is necessary to
675  stop any statute of limitations from expiring. Any agreement reached through mediation and signed by the parties will be binding. Any
676  agreement to mediate disputes or claims arising from this Agreement will survive settlement.
677  **28. RELEASE (9-05)**
678    Buyer releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES and any
679  OFFICER or PARTNER of any one of them and any other PERSON, FIRM or CORPORATION who may be liable by or
680  through them, from any and all claims, losses or demands, including, but not limited to, personal injury and property dam-
681  age and all of the consequences thereof, whether known or not, which may arise from the presence of termites or other wood-
682  boring insects, radon, lead-based paint hazards, mold, fungi or indoor air quality, environmental hazards, any defects in the
683  individual on-lot sewage disposal system or deficiencies in the on-site water service system, or any defects or conditions on the
684  Property. Should Seller be in default under the terms of this Agreement or in violation of any Seller disclosure law or regula-
685  tion, this release does not deprive Buyer of any right to pursue any remedies that may be available under law or equity. This
686  release will survive settlement.
687  **29. REAL ESTATE RECOVERY FUND (9-05)**
688    A Real Estate Recovery Fund exists to reimburse any persons who have obtained a final civil judgment against a Pennsylvania real
689  estate licensee (or a licensee's affiliates) owing to fraud, misrepresentation, or deceit in a real estate transaction and who have been
690  unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-
691  3658 or (800) 822-2113 (within Pennsylvania) and (717) 783-4854 (outside Pennsylvania).
692  **30. COMMUNICATIONS WITH BUYER AND/OR SELLER (1-10)**
693    Wherever this Agreement contains a provision that requires or allows communication/delivery to a Buyer, that provision shall be
694  satisfied by communication/delivery to the Broker for Buyer, if any, except for documents required to be delivered pursuant to
695  Paragraph 16. If there is no Broker for Buyer, those provisions may be satisfied only by communication/delivery being made
696  directly to the Buyer, unless otherwise agreed to by the parties. Wherever this Agreement contains a provision that requires or allows

697  Buyer Initials: **RF** /_____                ASR Page 12 of 13               Seller Initials: **VP** /_____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com

Ferreira

698    communication/delivery to a Seller, that provision shall be satisfied by communication/delivery to the Broker for Seller, if any. If
699    there is no Broker for Seller, those provisions may be satisfied only by communication/delivery being made directly to the Seller,
700    unless otherwise agreed to by the parties.
701 **31. HEADINGS (4-14)**
702    The section and paragraph headings in this Agreement are for convenience only and are not intended to indicate all of the mat-
703    ter in the sections which follow them. They shall have no effect whatsoever in determining the rights, obligations or intent of
704    the parties.
705 **32. SPECIAL CLAUSES (1-10)**
706    (A)   The following are attached to and made part of this Agreement if checked:
707       ☐  Sale & Settlement of Other Property Contingency Addendum (PAR Form SSP)
708       ☐  Sale & Settlement of Other Property Contingency with Right to Continue Marketing Addendum (PAR Form SSPCM)
709       ☐  Sale & Settlement of Other Property Contingency with Timed Kickout Addendum (PAR Form SSPTKO)
710       ☐  Settlement of Other Property Contingency Addendum (PAR Form SOP)
711       ☐  Appraisal Contingency Addendum (PAR Form ACA)
712       ☐  Short Sale Addendum (PAR Form SHS)
713       ☐  there is no addendum to this agreement of sale
714       ☐
715       ☐
716    (B)   Additional Terms: i-Buyer will provide proof of funds to seller within 5 business days
717       of execution of agreement of sale.
718           ii-Seller will provide Buyer with builder warranty within 5 business
719       days of execution for Buyer review.
720
721
722
723

724  Buyer and Seller acknowledge receipt of a copy of this Agreement at the time of signing.

725  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and which coun-
726  terparts together shall constitute one and the same Agreement of the Parties.

727  **NOTICE TO PARTIES: WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT.** Parties to this transaction are
728  advised to consult a Pennsylvania real estate attorney before signing if they desire legal advice.

729  Return of this Agreement, and any addenda and amendments, including return by electronic transmission, bearing the signatures
730  of all parties, constitutes acceptance by the parties.

731  _____/_____  Buyer has received the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code §35.336.

732  _____/_____  Buyer has received a statement of Buyer's estimated closing costs before signing this Agreement.

733  _____/_____  Buyer has received the Deposit Money Notice (for cooperative sales when Broker for Seller is holding deposit
734             money) before signing this Agreement.

735  _____/_____  Buyer has received the Lead-Based Paint Hazards Disclosure, which is attached to this Agreement of Sale. Buyer
736             has received the pamphlet Protect Your Family from Lead in Your Home (for properties built prior to 1978).

737  **BUYER**   _David Ferreira (signature)_        **DATE**  11/11/2014
         David Ferreira or assignee

738  **BUYER**   _____        **DATE** _____

739  **BUYER**   _____        **DATE** _____

740  Seller has received the Consumer Notice as adopted by the State Real Estate Commission at 49 Pa. Code § 35.336.
741  Seller has received a statement of Seller's estimated closing costs before signing this Agreement.

742  **SELLER**   _(signature)_        **DATE**  11/11/2014
         200 Christian Street Partners

743  **SELLER**   _____        **DATE** _____

744  **SELLER**   _____        **DATE** _____

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com     Ferreira

# Exhibit "C"

## ADDENDUM 2; PUNCH LIST

Addendum to contract dated _____ October 28, 2014 _____ between:
_____ 200 Christian Street Partners _____ (Sellers) and
_____ David Ferreira or assignee _____ (Buyers) on property located
at _____ 501A S 12th Street, Philadelphia, PA 19147 _____

PUNCH LIST ; seller agrees to address all items listed prior to settlement
1. house to be professionally cleaned
2. clean all vents/ductwork (full of dust & debris)
3. touch up paint as needed ex. hand prints/etc. - all rooms/locations/trim
1st floor
4. main front door- inside baseboard remove white marks
5. remove paint on on/off switch at top of basement stairs
6. clean cobweb ceiling
7. ceiling edge paint touch up
8. trim touch up in utility closet with sump pump
9. front closet door top; fix magnet/door catch
Bathroom
1. fix paint on floor/ toilet/vanity top. touch up light switch, fix drips on light about vanity.
backroom
1. address odor in closet closest to operating HVAC
Garage
1. paint and clean entrance door and walls in closet (south west wall)
2. tidy/paint entry lighting at ceiling
Stairwell to 2nd floor-
1. touch up paint walls, steps and landing
2. black marks on flooring
2nd floor
1. clean off counter tops
2. clean off pencil marks on counters
3. clean up and touch up base of sliding glass doors to porch
4. Lombard St window (lower right window lock)
5. fix cracking paint from wall to ceiling
6.
touch up paint on all outlets
3rd floor
1. small linen closet on south side of entrance hall, adjust door catch
2. re-paint ceiling
    a. repair work done on ceiling due to water leak
    b. cracking noted along east wall at ceiling -entire length
3. repair window lock set at corner lower window
Hallway- clean black marks on flooring
Corner bathroom (2nd bedroom) - fix broken window
Laundry room- clean all counter tops
Top deck-
1. water pooling top of parapet wall out to right of slider-John K has photo
2. same corner re-secure deck at corner
3. note:water seen pooling in gap outside exterior base of sliders underneath deck
4. slider lock needs adjustment- not functioning properly

Initials: _____ 12/5/14

Initials: _____ / _____

# Exhibit "D"



# Exhibit "E"



**Rimkus Consulting Group, Inc.**
3620 Horizon Drive, Suite 200
King of Prussia, PA 19406
(888) 623-1460 Telephone
(610) 941-1288 Facsimile

September 12, 2016

Peter Bryant, Esquire
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia, Pennsylvania 19102

Re:     Insured:    David Ferreira (Self Insured)
        Subject:    **Report of Conclusions**
    RCG File No:    47702110

Dear Mr. Bryant:

On July 23, 2015, it was reported by Mr. David Ferreira that immediately after he and his family moved into their residence in 2015, moisture intrusion occurred and subsequently caused damage to his residence. The Ferreira residence was located at 501A South 12th Street in Philadelphia, Pennsylvania (the Residence).

Rimkus Consulting Group, Inc. was retained to evaluate the reported damage, and to determine if there were any construction defects that affected the damage, caused poor building performance, or increased the risks for development of life-safety issues. This report was reviewed by Mr. Benjamin T. Irwin, District Manager.

In the course of our work, we completed the tasks outlined in the attached **Basis of Report**.

## Conclusions

1. The following construction defects observed at the Ferreira residence were not in compliance with the reference portions of the permit drawings and/or the applicable building codes and/or industry standards:

    A. Insufficient foundation wall height and untreated wood framing located too close to grade level: Wall Section 2 on Drawing Sheet A-4.1, and IRC Sections R404.1.6 and R317.1.2.5.

    B. Improper drainage system behind the brick veneer: 2009 International Residential Code (IRC) Section R703.1.1.

Case 2:16-cv-05759-RBS Document 11-1 Filed 10/30/18 Page 83 of 114

C. Lack of and/or inadequate flashing in at least eight differing location types throughout the building: Weather Barriers and Flashing Notes on Drawing Sheet CS.0, Wall Sections on Drawing Sheets A-4.0 and A-4.1, and IRC Sections R703.7.5, R703.7.6, R703.8 and R708.8.

D. Insufficient wall cavity thickness in the brick veneer: Partition Type P1, sheet A-0.0 and IRC Section R703.7.4.2.

E. Insufficient insulation and/or air barrier below the cupped wood flooring in the rear second-floor living room above the unheated garage. IRC N1102.4.7.

F. Improper wood support of the fourth-floor brick veneer above the third-floor rear bedroom, in lieu of a steel angle: Detail 1 on Drawing Sheet A-6.4 and IRC Section R703.7.2.2.

G. Improper attachment/embedment of the sheet metal masonry ties within the brick veneer: Building Code Requirements for Masonry Structures, (ACI 530-05/ASCE 5-05/TMS 402-05) Section 6.2.2.6.2 and IRC Section R703.7.4.

H. Lack of relief angles for the upper portions of the brick veneer: Detail 2 on Drawing Sheet A-4.2 and IRC Table R703.7(1).

2. Conditions A through D above permitted moisture intrusion through the exterior building envelope, causing moisture entrapment with the exterior wall cavities and corresponding moisture and/or mold-related damage to the adjacent wood sheathing and interior finishes. Open gaps and voids in the metal coping joints, exterior metal cladding systems, around the windows, at the interfaces between these systems, and at the interfaces adjacent to the brick veneer, also contributed to the moisture intrusion and related interior damage. These conditions represented on-going building performance issues that are expected to worsen with time.

3. Conditions A and F through H above were structural issues, which will affect the long term performance of the building. Additional structural issues, such as moisture-and/or mold-related damage to the structural components of the building should be anticipated with time, as conditions continue to progressively deteriorate. Such premature deterioration is already evident in the delaminated parallam beam formerly supporting the brickwork above the third-floor bedroom. This condition requires remedial action as the beam has already experienced a structural strength reduction from its design capacity.

4. Progressive deterioration involving seasonal freeze-thaw cycling of water entrapped within the exterior walls is anticipated to further weaken the deficient brick veneer ties, and will eventually lead to veneer detachment and collapse. This condition

represents a future life safety risk, if it is not remediated. There is currently one area of premature minor bulging present on the building.

5. Remedial actions are required to correct the construction defects, address the building envelope and structural performance issues, to mitigate the risks for the development of future life safety hazards, and to provide a constructed building that is compliant with the permit drawings and the applicable codes. Such remedial actions will require the services of qualified design professionals registered in the Commonwealth of Pennsylvania.

This requested short report contains the conclusions of our examination findings and does not contain a complete discussion of the investigative steps and analysis we undertook in order to formulate our conclusions. If an explanation of the conclusions is needed at a later date, at your request, a detailed report of findings can be completed.

Photographs taken during our work are retained in our files and are available to you upon request.

This report was prepared for the exclusive use of Bochetto & Lentz, P.C. and was not intended for any other purpose. Our report was based on the information available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

Thank you for allowing us to provide this service. If you have any questions or need additional assistance, please call.

*THE ORIGINAL OF THIS REPORT, SIGNED AND SEALED BY THE PROFESSIONAL WHOSE NAME APPEARS ON THIS PAGE, IS RETAINED IN THE FILES OF RIMKUS CONSULTING GROUP, INC.*

Sincerely,
RIMKUS CONSULTING GROUP, INC.

Daniel L. Isackson, AIA, LEED AP
PA Licensed Architect No. RA405994
District Manager

Attachments: Basis of Report, CV

September 12, 2016
RCG File No. 47702110

# **Basis of Report**

1. Mr. Anthony Volonnino, P.E. inspected and photographed the Residence on August 11, 2016.

2. Mr. Daniel L. Isackson, AIA, LEED AP inspected and photographed the Residence on August 18 and 26, 2016.

3. Mr. Frank E Hendron, CFC, CMC, MS, PhD was interviewed during the site visit on August 18, 29016, by Daniel L. Isackson, AIA, LEED AP.

4. Documents:

   a) The *Resident Condition Study*, dated July 23, 2015, published by Worldwide Engineering Service and Training.

   b) The *Moisture Intrusion Evaluation* report, November 19, 2015, published by the Shield and Compass Agency.

   c) *Synopsis of Findings and Recommendations,* January 16, 2016, published by Northeast Inspection Corporation.

   d) The Northeast Inspection field notes for the exterior wall readings.

   e) 501-7 South 12th Street, Philadelphia, Pennsylvania 19147 Building Permit Submission drawings, dated June 18, 2013, published by Harman Deutsch Architects.

   f) The City of Philadelphia Building Code.

   g) 2009 International Residential Code published by the International Code Council.

   h) *Building Code Requirements for Masonry Structures* (ACI 530-05/ASCE 5-05/TMS 402-05) published by the Masonry Standards Joint Committee.

September 12, 2016
RCG File No. 47702110

# CV





### DANIEL L. ISACKSON, R.A, LEED AP BD+C
### DISTRICT MANAGER

Mr. Isackson is a 1990 graduate from the University of Minnesota with a Bachelor of Architecture Degree and Bachelor of Environmental Design Degree (1988). He is a registered professional Architect with extensive experience in all phases of architecture, including preliminary design, construction documents, specifications, and contract/construction administration. His experience incorporates a broad range of skills including design, code analysis, project management, programming, site development, and cost estimating.

Mr. Isackson's past project types include commercial, multi-family residential, retail, educational, airport terminals, military facilities, mixed use urban development, historic renovation, and adaptive reuse. He has experience with building code compliance and life safety analysis, accessibility standards, and property condition assessments.

Currently, at Rimkus Consulting Group, Mr. Isackson is responsible for inspections and analysis of construction defects, storm damage, failures in building envelopes, building code and ADA accessibility code compliance, and premise liability evaluations in relation to falls, means of egress, slip-and-fall and trip-and-fall claims. Mr. Isackson is experienced with the Brungraber Mk 1 Articulated Strut Tribometer and the English XL Variable Incident Tribometer slip resistance meters. These inspections encompass commercial, residential, civic, religious, hospitality and multi-residential building types for construction claims and property claims and includes moisture intrusions, building envelope failures, brick veneer, stone veneer, stucco, residential and commercial plumbing failures, pipe freeze investigations, and window wall system and component deficiencies and failures. He has also provided expert witness testimony in arbitration, deposition, and trial.

### EDUCATION AND PROFESSIONAL ASSOCIATIONS

B.A. – Architecture, University of Minnesota, Minneapolis
B.E.D. – Environmental Design, University of Minnesota, Minneapolis
Registered Professional Architect (RA) licensed in Maryland, District of Columbia, Virginia, Pennsylvania, Delaware, New York, New Jersey, West Virginia, North Carolina, South Carolina, Ohio, Georgia, Massachusetts and Texas.
Leadership in Energy and Environmental Design Accredited Professional (LEED AP BD+C) -
    USGBC with specialty in Building Design and Construction
American Institute of Architects (AIA) – Member
National Council of Architectural Registration Boards (NCARB) – Member
Rimkus Training: Low Slope and Steep Slope Roofing
English XL Variable Incidence Tribometer Certified

### EMPLOYMENT HISTORY

| | |
|---|---|
| 2012 – Present | Rimkus Consulting Group, Inc. |
| 2006 – 2012 | Kann Partners, Baltimore, MD |
| 2004 – 2006 | URS Corporation, Hunt Valley, MD |
| 1989 – 2004 | Kann and Associates, Inc., Baltimore, MD |

**DANIEL L. ISACKSON, R.A, LEED AP BD+C**

| | |
|---|---|
| 1988 – 1988 | Design International, Inc., Baltimore, MD |
| 1986 – 1987 | Rust Architects, White Bear Lake, MN |

## DETAILED PROFESSIONAL EXPERIENCE:

**RIMKUS CONSULTING GROUP, INC.**      **2012 - PRESENT**

District Manager

In charge of office operations and personnel in the Baltimore office. Responsible for investigating and evaluating commercial and residential structures to determine the cause and origin of design and construction defects. Verify construction compliance with contract documents, industry standards, building codes, and ADA accessibility standards.

**Kann Partners**      **2006 – 2012**

Associate Principal, Senior Project Manager

Responsible for design, development, production of documents, and construction administration of commercial, retail, educational, historic renovation, and multi-family residential projects. Reviewed all projects for code compliance and assisted with project budgets and feasibility studies. Key projects included a 10 story concrete framed multi-family building, natatorium, renovation of a closed public school into a charter school, and historic renovation projects in Cumberland, MD and Baltimore City.

**URS Corporation**      **2004 – 2006**

Senior Project Architect

Responsible for design, development, and production of documents of airport and military Projects. Reviewed all projects for code compliance, and quality control. Reviewed military projects for compliance with Anti-terrorist Force Protection Standards and Unified Facility Criteria. Key projects included redesign of an airport terminal for the A380 Airbus, military administration building, military security entry gates, and property condition assessments.

**Kann and Associates, Inc.**      **1989 - 2004**

Associate Principal, Project Manager

Responsible for design, development, production of documents, and construction administration of commercial, historic renovation, structured parking, and multi-family residential projects. Reviewed all projects for code compliance and assisted with project budgets. Key projects included a mixed use urban development project in Baltimore City, and retail development in Baltimore, D.C, Virginia, and Pennsylvania. The mixed use project included, concrete post-tension framed 17-story residential tower and 6-story concrete post-tension framed structured parking facility. The retail projects were primarily steel framed.

**Design International, Inc.**      **1988 - 1988**

Intern Architect

Responsible for drafting, model making and presentation preparation for retail projects. Key projects included retail shopping centers.

**DANIEL L. ISACKSON, R.A., LEED AP BD+C**

**Rust Architects**                                                    **1986 - 1987**

<u>Intern Architect</u>

Responsible for drafting and model making for residential projects.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MILO, LLC** | : |
| | : |
| v. | : |
| | : |
| **VIRGIL PROCACCINO,** | : |
| **ARTHUR ELWOOD, and** | :     Civil Action No.: 2:16-cv-5759-RBS |
| **200 CHRISTIAN STREET PARTNERS** | : |
| | : |

## **CERTIFICATE OF SERVICE**

I, Peter R. Bryant, Esquire, caused a true and correct copy of the *First Amended*

*Complaint* to be served upon the following via first class mail and email:

Roy S. Cohen, Esquire
Cohan, Seglias, Pallas, Greenhall & Furman, P.C.
30 South 17th Street, 19th Floor
Philadelphia, PA 19103
rcohen@cohenseglias.com

Robert J. Cosgrove, Esquire
Melanie Brother, Esquire
Wade Clark Mulcahy
1515 Market Street, Suite 2050
Philadelphia, PA 19102
mbrother@wcmlaw.com; rcosgrove@wcmlaw.com

Date: January 30, 2017           Peter R. Bryant

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

**MILO, LLC,**                                          :
                                                       :          C.A. No. 2:16-cv-05759-RBS
        **v.**                                         :
                                                       :
**VIRGIL PROCACCINO, ARTHUR ELWOOD,** :
**And 200 CHRISTIAN STREET PARTNERS**         :
_____:

**JOINDER COMPLAINT OF DEFENDANTS**
**VIRGIL PROCACCINO, ARTHUR ELWOOD, AND 200 CHRISTIAN**
**STREET PARTNERS PURSUANT TO FED. R. CIV. P. 20(a)(2)**

Defendants Virgil Procaccino, Arthur Elwood, and 200 Christian Street Partners (collectively "200 CSP") make the following joinder complaint to join AB Construction LLC, Duggan Excavation, E&A Drywall Corp., High End Design Inc., Jeld-Wen, Inc., Maxi-Tech Inc., Red Lion Insulation, Stanley Stephens Co., Inc., and Tague Lumber as third-party defendants in the above-captioned action.  In support of this complaint, 200 CSP avers the following:

**I.        Nature of the Action**

1.        Milo LLC ("Milo") initiated this action against 200 CSP in November 2016.  (_See_ Pls.' Compl. ("ECF 1")).

2.        In January 2017, Milo filed an amended complaint, alleging several counts related to the construction and sale of a home located at 501A South 12th Street, Philadelphia, Pennsylvania 19147 (the "Home") that Milo purchased from 200 CSP.  (_See_ Pls.' Am. Compl. ("ECF 12") ¶ 33).

3.        Milo claims that 200 CSP made various mistakes with respect to the Home and the remediation efforts that were undertaken after discovering leaks and water infiltration issues.  (_See_ ECF 12).

4.      With respect to the work that was done at the Home, all construction materials were supplied by the Joinder Defendants.

5.      Similarly, all construction work at the Home was performed by the Joinder Defendants, not by 200 CSP.

## II.      Parties

6.      Milo LLC, the record owner of the Home, is a limited liability company formed in Delaware and has a registered office at 1600 Greentree Drive, Suite 101, Dover, Delaware 19904.

7.      200 Christian Street Partners is a limited liability company formed under Pennsylvania law.

8.      Virgil Procaccino is an individual and a partner in 200 Christian Street Partners.

9.      Arthur Elwood is an individual and a partner in 200 Christian Street Partners.

10.      Joinder Defendants:

a.      AB Construction LLC is a limited liability corporation registered to do business in Pennsylvania and has a registered business address at 11614 Proctor Place, Philadelphia, Pennsylvania 19116.

b.      Duggan Excavation is a Pennsylvania, non-stock corporation with registered business addresses at 446 Cedarwood Lane, Elkins Park, Pennsylvania 19027 and/or 1804 Afton Street, Philadelphia, Pennsylvania 19111.

c.      E&A Drywall Corporation is a New Jersey domestic profit corporation with a registered business address at 220-246 North 38th Street, Camden, New Jersey 08105.

2

      d.           High End Design Inc. is a Pennsylvania limited liability company with a registered business address at 2840 Pine Road, Unit A3, Huntingdon Valley, Pennsylvania 19006.

      e.           Jeld-Wen, Inc. is a public corporation that does business in Pennsylvania at 1162 Keystone Boulevard, Pottsville, Pennsylvania 17901.

      f.           Maxi-Tech Inc. is a Pennsylvania corporation with a registered business address at 3345 Ashville Street, Philadelphia, Pennsylvania 19136.

      g.           Red Lion Insulation has a registered business address at 66 E. Gloucester Pike, Barrington, New Jersey 08007-1323.

      h.           Tague Lumber is a Pennsylvania corporation with a registered business address at 325 Media Station Road, Media, Pennsylvania 19063.

      i.           Stanley Stephens Co., Inc. is a Pennsylvania corporation with a registered business address at 2565 Pearl Buck Road, Bristol, Pennsylvania 19007.

### III.   Jurisdiction

11.      This Honorable Court may exercise both general and specific personal jurisdiction over joinder defendants AB Construction LLC, Duggan Excavation, Maxi-Tech Inc., Stanley Stephens Co., Inc., High End Design Inc., Jeld-Wen, Inc., and Tague Lumber.

12.      This Honorable Court has specific personal jurisdiction over joinder defendants E&A Drywall Corporation and Red Lion Insulation.

13.      Complete diversity exists between Milo and 200 CSP, and the amount in controversy exceeds $75,000.

14.      Thus, this Honorable Court has original jurisdiction over Milo's claims against 200 CSP. *See* 28 U.S.C. § 1332 (2012).

3

15.     Therefore, this Honorable Court may also exercise supplemental jurisdiction over 200 CSP's claims against the joinder defendants.  *See id.* § 1367(a).

16.     Section 1367(a) grants federal district courts supplemental jurisdiction over all claims that are so related to the claims in the action over which the district court has original jurisdiction that they form part of the case or controversy.  *See id.*

17.     Claims form part of the case or controversy when they arise from a "'common nucleus of operative fact' and would ordinarily be expected to be tried together."  *See Mars Inc. v. Kabushiki-Kaisha Nippon Conlux*, 24 F.3d 1368, 1374 (3d Cir. 1994) (quoting *Utd. Mine Works of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).

18.     200 CSP's claims against the joinder defendants arise from the same transactions and occurrences as Milo's claims against 200 CSP, *e.g.*, the alleged deficiencies in the construction of the Home and resulting damages.

19.     Accordingly, this Honorable Court has subject matter jurisdiction over 200 CSP's claims against the joinder defendants.

## IV.     Venue

20.     Venue is proper in the Eastern District of Pennsylvania because the events giving rise to this action occurred here and a "substantial part of property that is the subject of the action is situated," specifically 501A South 12th Street, Philadelphia, Pennsylvania 19147.  *See* 28 U.S.C. § 1391(b)(2) (2012).

## V.     Common Facts

21.     AB Construction LLC, by and through its agents, performed work, including, but not limited to, the installation of brick walls on the exterior of the Home.  *See* AB Construction LLC Invoice ("**Exhibit A**").

4

22.     Duggan Excavation, by and through its agents, performed work, including, but not limited to, excavating and pouring the foundation of the Home.  *See* Duggan Excavation Invoice ("**Exhibit B**").

23.     E&A Drywall Corporation, by and through its agents, performed work, including, but not limited to, the installation of windows, doors, sheeting, and molding at the Home.  *See* E&A Drywall Corporation Proposal ("**Exhibit C**").

24.     High End Design Inc., by and through its agents, performed work, including, but not limited to, the installation of aluminum composite and two layers of moisture barrier at the Home.  *See* High End Design Inc. Invoice ("**Exhibit D**").

25.     Jeld-Wen, Inc., by and through its agents, manufactured windows and sold them to Tague Lumber Company that were used in the construction of the Home.  *See* Tague Lumber Invoice ("**Exhibit E**").

26.     Maxi-Tech Inc., by and through its agents, performed the installation of the roof on the Home.  *See* Maxi-Tech Inc. Invoice ("**Exhibit F**").

27.     Red Lion Insulation installed insulation at the Home.  *See* Red Lion Work Agreement ("**Exhibit G**").

28.     Tague Lumber, by and through its agents, sold defective windows and building materials that were used in the construction of the Home.  *See* **Exhibit E**.

29.     Stanley Stevens Co., Inc. manufactured and distributed hardwood flooring, which was installed at the Home.  *See* Stanley Stephens Co., Inc. Invoice ("**Exhibit H**").

## COUNT I—COMMON LAW INDEMNIFICATION
## 200 CSP V. ALL JOINDER DEFENDANTS

30.        200 CSP repeat and reiterate each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "29" inclusive, with the same force and effect as if set forth here more particularly at length.

31.        If damages were sustained as alleged by Milo, it was solely because of the negligence, carelessness, and intentional acts or omissions of the joinder defendants and joinder defendants' agents, servants, and/or employees in performing work at the Home.

32.        If judgment or settlement is recovered by Milo, such recovery will have come about solely because of the negligence, carelessness, and intentional acts or omissions of the joinder defendants and not any negligence, carelessness, or intentional acts or omissions by 200 CSP.

33.        As such, 200 CSP are entitled to common law indemnity from the joinder defendants.

## COUNT II—CONTRIBUTION
## 200 CSP V. ALL JOINDER DEFENDANTS

34.        200 CSP repeat and reiterate each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "33" inclusive, with the same force and effect as if set forth here more particularly at length.

35.        In the alternative, while denying any liability on 200 CSP's part, should Milo recover damages in this action, the joinder defendants are liable over to 200 CSP for contribution of any monies that 200 CSP may be found liable or responsible to Milo.

## COUNT III—NEGLIGENCE
## 200 CSP V. ALL JOINDER DEFENDANTS

36.     200 CSP repeats and reiterates each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "35" inclusive, with the same force and effect as if set forth here more particularly at length.

37.     The joinder defendants all either performed work at the Home or supplied materials used in the construction of the Home.

38.     To the extent that Milo suffered the injuries and damages as alleged, said injuries and damages were caused in whole or in part because of the joinder defendants' negligent performance of their work.

39.     The joinder defendants were negligent in the following respects:

   a.   Failing to comply with industry standards;

   b.   Failing to comply with applicable building codes;

   c.   Failing to perform their work in a reasonable and workmanlike manner;

   d.   Failing to follow manufacturers' specifications and guidelines regarding the use, construction and installation of products and components in the Home; and

   e.   Utilizing defective products in the installation of components and/or construction of the Home.

40.     200 CSP denies any and all liability for the claims asserted by Milo.

41.     But if, upon adjudication of Milo's cause of action, it is determined that any of the work involving the construction of the Home or products used therein were defective or were improperly performed and, in some way, caused Milo's damages, the joinder defendants are liable for negligence, and 200 CSP seek all damages flowing from that negligence.

## COUNT IV—BREACH OF IMPLIED
## WARRANTY OF FITNESS FOR ORDINARY PURPOSE
## 200 CSP V. TAGUE LUMBER AND JELD-WEN, INC.

42.      200 CSP repeats and reiterates each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "41" inclusive, with the same force and effect as if set forth here more particularly at length.

43.      Tague Lumber is engaged in the business of selling and/or distributing windows and/or window components.

44.      Jeld-Wen, Inc. ("Jeld-Wen") is engaged in the business of manufacturing, selling, and distributing windows and/or window components.

45.      Tague Lumber's and Jeld-Wen's products constitute "goods" under the Pennsylvania Uniform Commercial Code.

46.      Tague Lumber's and Jeld-Wen's products are provided with implied warranties of merchantability and fitness for a particular purpose.

47.      The defects in the Jeld-Wen windows and window components, which were sold and distributed by Tague Lumber as set forth herein, constitute breaches of said implied warranties.

48.      200 CSP deny any and all liability for the claims asserted by Milo.

49.      But if, upon adjudication of Milo's cause of action, it is determined that Milo sustained damages to the Home, Tague Lumber's breach of their implied warranties of merchantability and fitness for a particular purpose caused and/or contributed to the aforementioned damages, and 200 Christian Street Defendants seek all damages flowing from that breach.

## COUNT V—STRICT PRODUCTS LIABILITY
## 200 CSP V. JELD WEN, INC.

50.     200 CSP repeats and reiterates each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "49" inclusive, with the same force and effect as if set forth here more particularly at length.

51.     Jeld-Wen designed and manufactured the windows and window components, which were, upon information and belief, installed at the Home.

52.     Jeld-Wen is engaged in the business of selling and/or distributing windows and window related components.

53.     The windows and window components are "products" for purposes of § 402A of the Restatement (Second) of Torts.

54.     Jeld-Wen sold said windows and window components in a defective and unreasonably dangerous condition.

55.     Said defects include the following:

    a.  Failing to properly caulk and seal the windows and window components;

    b.  Failing to manufacture the windows and window components consistent with design plans;

    c.  Utilizing inferior components, parts and materials in the construction of the windows and window components; and

    d.  Failing to ensure that the windows and window components were properly sealed to prevent moisture infiltration.

56.     200 CSP denies any and all liability for the claims asserted by Milo.

57.     But if, upon adjudication of Milo's cause of action, it is determined that Milo sustained damages to the Home, the defects in the Jeld-Wen windows and window components

caused and/or contributed to the aforementioned damages, and 200 CSP seek all damages flowing from those product defects.

**WHEREFORE**, 200 CSP respectfully requests judgment in its favor and against all other parties together with any such other, further and different relief that this Honorable Court deems just and proper.

Dated: May 2, 2018
       Philadelphia, PA

WADE CLARK MULCAHY LLP

*/s/ Robert J. Cosgrove*
_____
Robert J. Cosgrove, Esq.

*/s/ Alexandra M. Perry*
_____
Alexandra M. Perry, Esq.

# EXHIBIT C

ROBERT J. COSGROVE, ESQ.
rcosgrove@wcmlaw.com (E-mail)
Attorney ID # 204665
ALEXANDRA M. PERRY, ESQ.
Attorney ID # 319072
aperry@wcmlaw.com
Wade Clark Mulcahy
1515 Market Street, Suite 2050
Philadelphia, PA 19102
(267) 239-5526 (Phone)                    Attorneys for 200 Christian Street
Our File No.:  812.10562                   Partners, LLC, Virgil Procaccino,
                                          Arthur Elwood

<table>
<tr><td><strong>NOTICE TO PLEAD</strong></td></tr>
<tr><td>To:  Joinder Defendants<br>   You are hereby notified to file a written response to the enclosed Amended Joinder Complaint within twenty (20) days from service hereof or a judgment may be entered against you.</td></tr>
</table>

---

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA, PENNSYLVANIA
### CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| ZACHARY KLEHR and | : | |
| DEBORAH KLEHR, | : | SEPTEMBER TERM, 2017 |
| | : | |
| Plaintiffs, | : | |
| | : | Case No.: 02547 |
| v. | : | |
| | : | |
| 200 CHRISTIAN STREET PARTNERS, LLC | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |
| ——————————————————— | : | |
| | : | |
| 200 CHRISTIAN STREET PARTNERS, LLC, | : | |
| VIRGIL PROCACCINO and ARTHUR | : | |
| ELWOOD, | : | |
| | : | |
| Joinder Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| AB CONSTRUCTION, LLC, TIR EOGHAIN | : | |
| CONSTR., INC. D/B/A DUGGAN EXCAVATION: | | |
| E&A DRYWALL CORPORATION, HIGH END | : | |
| DESIGN, INSTALLATIONS, LLC, JELD WEN | : | |
| WINDOWS AND DOORS, MAXI-TECH | : | |
| ROOFING, INC, PHILLY BRICK AND STONE | : | |
| RESTORATION, LLC, TAGUE LUMBER | : | |
| OF MEDIA, INC. and  STRAWBRIDGE CROWE | : | |

LLC T/A J MALONEY & SON          :
                                              :
                Joinder Defendants       :
_____  :

### AMENDED JOINDER COMPLAINT OF DEFENDANT 200 CHRISTIAN STREET PARTNERS, LLC DIRECTED TO ADDITIONAL DEFENDANTS ---- AB CONSTRUCTION, LLC; TIR EOGHAIN CONSTRUCTION, INC. D/B/A DUGGAN EXCAVATION; E&A DRYWALL CORPORATION; HIGH END DESIGN INSTALLATIONS, LLC; JELD WEN WINDOWS AND DOORS; MAXI-TECH ROOFING, INC.; PHILLY BRICK AND STONE RESTORATION, LLC; TAGUE LUMBER OF MEDIA, INC. AND J. MALONEY & SON, LLC

Defendant/joinder plaintiffs, 200 CHRISTIAN STREET PARTNERS, LLC ("200 Christian Street"), VIRGIL PROCACCINO ("Procaccino") and ARTHUR ELWOOD ("Elwood") (collectively "200 Christian Street Defendants"), by and through their attorneys, Wade Clark Mulcahy, hereby incorporate their answer to plaintiffs' Zachary Klehr ("Z. Klehr") and Deborah Klehr ("D. Klehr") (collectively "Klehr") amended complaint, as fully as though the same were set forth at length herein, and file the within amended joinder complaint against additional defendants AB Construction LLC ("AB Construction"), TIR Eoghain Construction, Inc. d/b/a Duggan Excavation ("Duggan Excavation"), E & A Drywall Corporation ("E&A Drywall"), High End Design Installations, LLC ("High End Design"), Jeld Wen Windows and Doors ("Jeld Wen"), Maxi-Tech Roofing, Inc. ("Maxi-Tech"), Philly Brick and Stone Restoration, LLC ("Philly Brick and Stone"), Tague Lumber of Media, Inc. ("Tague Lumber") and Strawbridge Crowe, LLC T/A J. Maloney & Son ("J. Maloney") (collectively "Joinder Defendants") and aver as follows:

### THE UNDERLYING ACTION

*The Claims*

1.      On or about December 6, 2017, Klehr filed an amended complaint, in the Pennsylvania Court of Common Pleas, Philadelphia County, against the 200 Christian Street

Defendants and Harman Deutsch Corporation ("Harman Deutsch"). *See* First Amended Complaint, attached hereto as **Exhibit A**.

2.      The amended complaint alleges that the 200 Christian Street Defendants negligently built, marketed and sold Klehr a defectively constructed home for $1,650,000.00. *See* **Exhibit A**, ¶ 1.

3.      Specifically, Klehr alleges that after they entered into an Agreement of Construction and Sale with 200 Christian Street for the purchase and construction of their home, located at 507 South 12th Street in Philadelphia ("the Home"), they began to experience leaks and water infiltration issues in the Home, resulting in irreparable harm and damage. *See* **Exhibit A**.

4.      Klehr claims that 200 Christian Street Defendants made various mistakes in respect of the construction of the Home and the remediation efforts that were undertaken upon discovery of the various leaks and water infiltration issues. *See* **Exhibit A**.

5.      In respect of the work that was done at the Home, all construction work was performed or construction materials supplied by the Joinder Defendants and not by 200 Christian Street Defendants.

*The Joinder Defendants*

6.      Additional defendant AB Construction is a limited liability corporation registered in Pennsylvania with a registered business address at 11614 Proctor Place, Philadelphia, Pennsylvania 1911.

7.      Additional defendant AB Construction, by and through their agents, performed work, including, but not limited to, installation of brick walls on the exterior of the Home. *See* AB Construction Invoice, attached hereto as **Exhibit B**.

8.     Additional defendant Duggan Excavation is a Pennsylvania non-stock corporation with a registered business address at 446 Cedarwood Lane, Elkins Park, Pennsylvania 19027 and/or 1804 Afton Street, Philadelphia, Pennsylvania 19111.

9.     Additional defendant Duggan Excavation, by and through its agents, performed work including, but not limited to, excavating and pouring the foundation of the Home.  *See* Duggan Excavation Invoice, attached hereto as **Exhibit C**.

10.     Additional defendant E&A Drywall is a New Jersey domestic profit corporation with a registered business address at 220-246 North 38th Street, Camden, New Jersey 08105.

11.     Additional defendant E&A Drywall, by and through its agents, performed work including, but not limited to, the installation of windows, doors, sheeting and molding at the Home.  *See* E&A Drywall Proposal, attached hereto as **Exhibit D**.

12.     Additional defendant High End Design is a Pennsylvania limited liability company with a registered business address at 2840 Pine Road, Unit A3, Huntingdon Valley, Pennsylvania 19006.

13.     Additional defendant High End Design, by and through its agents, performed work including, but not limited to the installation of aluminum composite and two layers of moisture barrier at the Home.  *See* High End Design Invoice, attached hereto as **Exhibit E**.

14.     Additional defendant Jeld Wen is a public corporation which does business in Pennsylvania, at 1162 Keystone Boulevard, Pottsville, Pennsylvania 17901.

15.     Additional defendant Jeld Wen, by and through its agents, manufactured windows which were sold to Tague Lumber and used in the construction of the Home.  *See* Tague Lumber Invoice, attached hereto as **Exhibit F**.

16.     Additional defendant Maxi-Tech is a Pennsylvania corporation with a registered business address at 3345 Ashville Street, Philadelphia, Pennsylvania 19136.

17.     Additional defendant Maxi-Tech, by and through its agents, performed the installation of the roof on the Home.  *See* Maxi-Tech Roof Invoice, attached hereto as **Exhibit G**.

18.     Additional defendant Philly Brick and Stone is a Pennsylvania limited liability company with a registered business address at 9311 James Street, Suite B, Philadelphia, Pennsylvania 19114.

19.     Additional defendant Philly Brick and Stone, by and through its agents, installed bricks on the exterior of the Home.

20.     Additional defendant Tague Lumber is a Pennsylvania corporation with a registered business addresses at 325 Media Station Road, Media, Pennsylvania 19063.

21.     Additional defendant Tague Lumber, by and through its agents, sold defective windows and building materials that were used in the construction of the Home.  *See* **Exhibit F**.

22.     Additional defendant J. Maloney is a New Jersey limited liability corporation with a registered business address at 3 South Route 73, P.O. Box 329, Cedar Brook, New Jersey 08018.

23.     Additional defendant J. Maloney, by and through its agents, installed heating, air conditioning and ductwork in the Home.  *See* J. Maloney Proposal, attached hereto as **Exhibit H**.

**COUNT I – COMMON LAW INDEMNIFICATION**
**200 CHRISTIAN STREET DEFENDANTS V. ALL JOINDER DEFENDANTS**

24.     200 Christian Street Defendants repeat and reiterate each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "23" inclusive, with the same force and effect as if set forth here more particularly at length.

25.     If damages were sustained as alleged in the Underlying Action, it was solely because of the negligence, carelessness, and acts or omissions of Joinder Defendants and Joinder Defendants' agents, servants and/or employees in performing work at the Home.

26.     If judgment or settlement is recovered by Klehr for the Underlying Action, such recovery will have come about solely because of the negligence, carelessness and acts or omissions of Joinder Defendants and not any negligence, carelessness and intentional acts or omissions by the 200 Christian Street Defendants.  As such, 200 Christian Street Defendants are entitled to common law indemnity from Joinder Defendants.

**COUNT II – CONTRIBUTION**
**200 CHRISTIAN STREET DEFENDANTS V. ALL JOINDER DEFENDANTS**

27.     200 Christian Street Defendants repeat and reiterate each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "26" inclusive, with the same force and effect as if set forth here more particularly at length.

28.     In the alternative, while denying any liability on 200 Christian Street Defendants' part, should Klehr recover damages in this action, Joinder Defendants are liable over to 200 Christian Street Defendants for contribution of any monies that 200 Christian Street Defendants may be found liable or responsible to Klehr.

**COUNT III – NEGLIGENCE**
**200 CHRISTIAN STREET DEFENDANTS V. AB CONSTRUCTION,**
**DUGGAN EXCAVATION, E&A DRYWALL, HIGH END DESIGN, MAXI-**
**TECH, PHILLY BRICK AND STONE, TAGUE LUMBER, AND J.**
**MALONEY**

29.     200 Christian Street Defendants repeat and reiterate each and every allegation heretofore made in this joinder complaint in the paragraphs designated "1" through "28" inclusive, with the same force and effect as if set forth here more particularly at length.

30.     AB Construction, Duggan Excavation, E&A Drywall, High End Design, Maxi-Tech, Philly Brick and Stone, Tague Lumber, and J. Maloney either performed work at the Home or supplied materials used in the construction of the Home.

31.     To the extent that Klehr suffered the injuries and damages as alleged, said injuries and damages were caused in whole or in part because of additional defendant's AB Construction, Duggan Excavation, E&A Drywall, High End Design, Maxi-Tech, Philly Brick and Stone, Tague Lumber, and J. Maloney negligent performance of their work.

32.     Additional defendants joined AB Construction, Duggan Excavation, E&A Drywall, High End Design, Maxi-Tech, Philly Brick and Stone, Tague Lumber, and J. Maloney were negligent in the following respects:

      a.  Failing to comply with industry standards;

      b.  Failing to comply with applicable building codes;

      c.  Failing to perform their work in a reasonable and workmanlike manner;

      d.  Failing to follow manufacturers' specifications and guidelines regarding the use, construction and installation of products and components in the Home; and

    e.   Utilizing defective products in the installation of components and/or construction of the Home.

33.    200 Christian Street Defendants deny any and all liability for the claims asserted by Klehr, but if upon adjudication of Klehr's cause of action it is determined that any of the work involving the construction of the Home or products used therein were defective or was improperly performed and in some way caused Klehr's damages, it is averred that AB Construction, Duggan Excavation, E&A Drywall, High End Design, Maxi-Tech, Philly Brick and Stone, Tague Lumber, and J. Maloney are liable for negligence and 200 Christian Street Defendants seek all damages flowing from that negligence.

WHEREFORE, 200 Christian Street Defendants respectfully request that this Court enter judgment in its favor, and against all other parties together with any relief that this Court deems just and proper.

Dated: Philadelphia, PA
        August \_\_\_, 2018

WADE CLARK MULCAHY LLP

_____
Robert J. Cosgrove, Esq.

## <u>**VERIFICATION**</u>

I, _____, verify that I am authorized to make this verification on behalf of 200 Christian Street Partners, LLC and Virgil Procaccino.  The foregoing pleading is true and correct to the best of my knowledge and belief.   I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. relating to unsworn falsification to authorities.

Dated:          Philadelphia, PA
                August ___, 2018


                                                        _____
                                                        Virgil Procaccino

## <u>VERIFICATION</u>

I, _____, verify that I am authorized to make this verification on behalf of 200 Christian Street Partners, LLC and Arthur Elwood.  The foregoing pleading is true and correct to the best of my knowledge and belief.   I understand that false statements herein are made subject to the penalties of 18 Pa.C.S.A. relating to unsworn falsification to authorities.

Dated:          Philadelphia, PA
                   August ___, 2018


                                                    _____
                                                    Arthur Elwood

# EXHIBIT D

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | |
|---|---|
| ZACHARY KLEHR and DEBORAH KLEHR **Plaintiffs,** | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| v. | SEPTEMBER TERM 2017 |
| **200 CHRISTIAN STREET PARTNERS, LLC, et al., Defendants.** | NO.: 02547 |
| | CONTROL NO.: 18032704 |
| **200 CHRISTIAN STREET PARTNERS, LLC, VIRGIL PROCACCINO, and ARTHUR ELWOOD Joinder Plaintiffs,** | |
| v. | |
| **AB CONSTRUCTION, LLC, TIR EOGHAIN CONSTR., INC. d/b/a DUGGAN EXCAVATION, E&A DRYWALL CORPORATION, HIGH END DESIGN, INSTALLATIONS, LLC, JELD WEN WINDOWS AND DOOR, MAXI-TECH ROOFING, INC., PHILLY BRICK AND STONE RESTORATION, LLC, TAGUE LUMBER OF MEDIA, INC., and STRAWBRIDGE CROWE LLC T/A J MALONEY & SON Joinder Defendants.** | |

## ORDER

**AND NOW**, this 16 day of August, 2018, upon consideration of the Preliminary Objections of Joinder Defendant, JELD-WEN, Inc., and Joinder Plaintiffs' response thereto, this Court finding that Paragraphs 25, 26, and 45 of Joinder Plaintiff's Joinder Complaint contain scandalous and impertinent allegations, it is hereby **ORDERED** and **DECREED** that Joinder Defendant's Preliminary Objections are **SUSTAINED**. Joinder Plaintiffs are granted leave of twenty (20) days from the docketing of this Order to file an Amended Joinder Complaint.

IT IS FURTHER ORDERED that Counts Three, Four, and Five of Joinder Plaintiffs' Joinder Complaint are hereby **DISMISSED** with prejudice.

BY THE COURT:

K. SHREEVES-JOHNS, J.

Klehr Etal Vs Procaccin-ORDER

17090254700082